49 F.3d 1208
 63 USLW 2571
 UNITED STATES of America, ex rel. Glenn A. HALL, Michael A.
Mapes and Fred Tribble, Plaintiffs-Appellants,
v.
TRIBAL DEVELOPMENT CORPORATION, a Wisconsin corporation,
John Doe Corporation, John Doe, et al.,
Defendants-Appellees.
 No. 93-3519.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 9, 1994.
Decided Oct. 24, 1994.
Rehearing Granted and Opinion Vacated Dec. 20, 1994.
Decided on Rehearing March 9, 1995.
 
 Thomas O. Albers, Mark John Vieno (argued), Courey, Albers, Gilbert & Riley, Dean J. Dovolas, Minneapolis, MN, for plaintiffs-appellants.
 John M. Peebles, Shentell L. Auffart (argued), Peebles & Evans, Omaha, NE, for defendants-appellees.
 Before MESKILL,* FLAUM, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 The plaintiffs, Glenn A. Hall, Michael A. Mapes and Fred Tribble, appeal from the district court's dismissal of their action seeking to void certain contracts entered into between the defendants, Tribal Development Corporation, and the Menominee Indian Tribe. According to plaintiffs' amended complaint, the defendants entered into lease contracts for goods and services to be used by the Tribe in the operation of gaming activities on their reservation. The plaintiffs, who do not claim to be Indians, alleged that the lease contracts violated 25 U.S.C. Sec. 81 in that they had not been sent to nor approved by the Bureau of Indian Affairs in the Department of the Interior.[1] That being the case, the plaintiffs, as private citizens on behalf of the United States, brought this action pursuant to the qui tam[2] provisions of section 81 to void the lease contracts and to recover all monies given in consideration thereof, one-half going to the United States Treasury on behalf of the Tribe, the other half going to plaintiffs as their bounty for maintaining a successful action under the statute. Plaintiffs also alleged that the defendants were not licensed as traders to the Tribe as required by section 264[3] of the Indian Traders Licensing Act (ITLA). Pursuant to the qui tam provision of 25 U.S.C. Sec. 201,[4] the plaintiffs sought to recover from defendants all civil penalties resulting from their violations of the ITLA, as well as a forfeiture of all the gambling equipment leased to the Tribe. Plaintiffs' final claim was that the lease contracts violated various provisions of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. Secs. 2701 to 2721 and, once again, relying upon the qui tam provision of 25 U.S.C. Sec. 201, maintained that they were entitled to recover all civil penalties as provided for under Sec. 2713 of the IGRA. The district court sua sponte determined that plaintiffs had no standing to maintain any of their claims and, on that basis, dismissed the plaintiffs' complaint. Before evaluating that determination, we touch briefly on the history surrounding the present action.
 
 I.
 
 2
 This action was originally part of a group of consolidated cases (forty-two to be exact) filed by the plaintiffs in the United States District Court for the Third District of Minnesota against various merchants who provided goods and services to the Tribe for use in the gaming operations on Tribal reservations. Several of the defendants filed motions to dismiss; others responded with motions for summary judgment. Pursuant to a stipulation agreement entered into between the plaintiffs and certain defendants, the Minnesota District Court entered an order for change of venue and, on May 17, 1993, transferred the present action, No. 93-3519, to the United States District Court for the Eastern District of Wisconsin. On that same day, the plaintiffs filed their amended complaint in the Eastern District Court of Wisconsin.
 
 
 3
 On August 6, 1993, the Wisconsin District Court sua sponte entered an order stating that it had recently reviewed the Minnesota District Court's disposition of the parallel suit in In Re United States ex rel. Hall Litigation, 825 F.Supp. 1422 (D.Minn.1993), aff'd, United States ex rel. Hall v. Creative Games Technology, Inc., 27 F.3d 572 (8th Cir.1994), handed down a month after the present action had been transferred, in which that court determined that plaintiffs, as third parties with no direct interest in the challenged contracts, could not allege an "injury-in-fact" as required under Article III, and therefore were without standing to maintain their qui tam actions under 25 U.S.C. Secs. 81 and 201. See Hall, 825 F.Supp. at 1426-27. The Wisconsin District Court was persuaded by this reasoning (particularly that it was applied to the same plaintiffs) and therefore entered an order notifying the parties that they had twenty days in which to show good cause why the present action should not be dismissed for lack of subject matter jurisdiction.
 
 
 4
 On September 15, 1993, the Wisconsin District Court notified the parties that it was dismissing the plaintiffs' suit for lack of standing. In a short order, the court reiterated that it was persuaded by the reasoning of the Minnesota District Court. The court also observed that the statutes on which plaintiffs relied were enacted for the protection of Indians, whereas plaintiffs were non-Indians, thus placing them outside the "zone of interests" the statutes were intended to protect. See United States ex rel. Hall v. Tribal Development Corp., No. 93-C-494 (E.D.Wis. Sept. 15, 1993). The court concluded that because this case was indistinguishable from the Minnesota suit in Hall, it was adopting the decision of that case and accordingly dismissed the plaintiffs' suit for lack of subject matter jurisdiction. Id.
 
 II.
 
 5
 Article III, section 2 of the United States Constitution "limits the 'judicial power' to the resolution of 'cases' and 'controversies.' " Valley Forge College v. Americans United For Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). One of the incidents of Article III's case-or-controversy requirement "is that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." Id. Standing, in turn, is comprised of three elements: First, the plaintiff must have suffered an "injury-in-fact"--an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit--that is, the injury has to be traceable to the defendant and not the result of the conduct of a third person not a party to the action before the court. Third, it must be likely that the injury will be redressed through a favorable decision by the court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).
 
 
 6
 The issue before us concerns the first element, namely, whether the plaintiffs have suffered a cognizable "injury-in-fact." The district court apparently was of the view that the plaintiffs, as non-Indians who were not parties to the contract entered into between the Tribe and the defendants, failed to allege an actual or concrete injury to themselves and were therefore unable to satisfy the injury-in-fact requirement of Article III. We say "apparently," because the district court, in dismissing plaintiffs' suit, refrained from making any analysis of its own, and instead stated that it was adopting outright the opinion of the Minnesota District Court in Hall. And that court concluded that the plaintiffs' failure to allege a personal injury left them without standing to sue. See Hall, 825 F.Supp. at 1425-27.[5]
 
 
 7
 But we think that in focusing on whether Hall, Mapes and Tribble themselves were personally injured for purposes of Article III, the district court bypassed the real plaintiff in this suit. This is not a garden-variety private suit brought by Hall, Mapes and Tribble against the defendants. Rather, it is a qui tam action, brought in the name of and on behalf of the United States, as witnessed by the caption of the complaint filed in the district court: "United States ex rel. Glenn A. Hall, Michael A. Mapes, and Fred Tribble." This is not an instance of artful pleading. Rather it is a requirement of the statutes under which these actions were brought, see 25 U.S.C. Sec. 81 (suit to recover under this section must be brought "in the name of the United States"); 25 U.S.C. Sec. 201 (suit to recover penalties under Title XVIII of the Revised Statutes of 1834 must be brought "in the name of the United States"). It is also a requirement of the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 17(a) ("when a statute of the United States provides, an action for the use or benefit of another shall be brought in the name of the United States."); see also 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Sec. 1551 at 390 (1990) (same). This makes sense. Qui tam suits by definition involve suits brought by private parties to assist the executive branch in its enforcement of the law, the violation of which affects the interest of the government, not the individual relator, whose only motivation in bringing the suit is to recover a piece of the action given by statute. So when a legislative body enacts provisions enabling qui tam actions, that act carries with it an understanding that in such suits it is the government, and not the individual relator, who has suffered the injury resulting from the violation of the underlying law and is therefore the real plaintiff in the action.[6]
 
 
 8
 Although the Supreme Court has never directly addressed this question, statements from different Justices make it reasonable to infer that if presented with the question today the Court would approve of the notion that it is the government, and not the individual relator, who is the real plaintiff in a qui tam suit. For example, in Marvin v. Trout, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905), Justice Peckham spoke approvingly of qui tam actions, noting that such actions "by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government." Id. at 225, 26 S.Ct. at 34 (emphasis added). Decades later, the Court in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), upheld the right of a qui tam relator to bring suit in the name of the United States to recover half the damages sustained by the government resulting from violations of the False Claims Act. Writing for the Court, Justice Black rebuffed a challenge to the propriety of qui tam provisions in general when he stated that "[q]ui tam suits have been frequently permitted by legislation, and have not been without defense by the courts." Id. at 541, 63 S.Ct. at 383 (including in a footnote the language we previously quoted from Marvin, as well as citation to one of the qui tam provisions at issue in this suit, 25 U.S.C. Sec. 201). In Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court upheld a taxpayer's standing to challenge the expenditure of federal funds under the Elementary and Secondary Educational Act of 1965 by parochial schools as violating the First Amendment. In his dissent, Justice Harlan disagreed with the Court's view that the plaintiff had a sufficient personal or proprietary interest in the federal funds to confer standing to sue. What is important for our purposes is that portion of his dissenting opinion, in which he states that parties lacking a personal stake in the litigation may nevertheless have standing under Article III "when acting as private attorneys-general as 'representatives of the public interest.' " Id. at 120, 88 S.Ct. at 1963 (Harlan, J., dissenting) (citing, inter alia, cases involving qui tam actions, notably, Marvin and United States ex rel. Marcus ) (emphasis added). Finally, Justice Scalia, writing for the Court in Lujan, implicitly acknowledges that the United States is the real plaintiff in qui tam actions when he observes in dicta that these are "suit[s] against a private party for the government's benefit." Lujan, 504 U.S. at 572-73, 112 S.Ct. at 2143 (emphasis added).
 
 
 9
 Lower courts, on the other hand, have been more direct. Although we have not found a decision addressing this in the context of the qui tam statutes before us, several circuit courts have unequivocally held that in a qui tam action to recover for violations of the False Claims Act, 31 U.S.C. Secs. 3729 to 3733 (West Supp.1994), it is the government, not the individual relator, who is the real plaintiff in the suit. See, e.g., United States ex rel. Killingsworth v. Northrop Corp., 25 F.3d 715, 720 (9th Cir.1994) ("It is clear ... that in a qui tam action, the government is the real party in interest"); United States ex rel. Kreindler v. United Technologies, 985 F.2d 1148, 1154 (2d Cir.) ("the government remains the real party in interest ... in the qui tam suit"), cert. denied, --- U.S. ----, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Center, 961 F.2d 46, 48 (4th Cir.1992) ("the United States must be the real plaintiff in this suit").
 
 
 10
 Once we accept the premise that the United States is the real plaintiff in a qui tam action, it stands to reason that challenges to the standing of the government's representative are beside the point. The United States, like a corporation, must act through its agents. When it acts in a prosecutorial fashion, it usually does so through attorneys within the Department of Justice, or one of its executive agencies. See United States ex rel. Troung v. Northrop Corp., 728 F.Supp. 615, 619 (C.D.Cal.1989); Evan Caminker, The Constitutionality of Qui Tam Actions, 99 Yale L.J. 382 (1989). In such instances, no one would question whether the Assistant United States Attorney prosecuting the government's case has suffered a sufficient injury-in-fact or possesses enough of a personal stake in the matter in order to satisfy the requirements of Article III; it is enough that the United States, as the represented party, has been injured. That Congress should enlist a private party, instead of one of the government's more common representatives, to champion the government's case should not change this outcome. Nor, for that matter, should it be necessary for the private qui tam relator to demonstrate a "personal stake" in the outcome of the dispute any more than it would be necessary for an Assistant United States Attorney to prove that he has a personal stake in the outcome of the case--for example, receiving his salary, advancing his career or achieving personal fulfillment--before he would be allowed to litigate on behalf of the government. See Caminker, supra at 382-83. Rather, for the purpose of establishing standing, it is enough that there "exist[s] ... a clearly defined, adversarial relationship between the government and the defendant, not between the defendant and the United States' particular legal representative." United States ex rel. Truong, 728 F.Supp. at 619; Caminker, supra at 383; see also United States ex rel. Kreindler, 985 F.2d at 1154 ("In a qui tam action [under the False Claims Act], the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury "); United States ex rel. Milam, 961 F.2d at 49 ("the government, and not the relator, must have suffered the 'injury in fact' required for Article III"). It is enough, then, that the United States, as the entity on whose behalf and in whose name this suit was brought, has suffered an injury-in-fact under Article III. Requiring an additional showing of injury on the part of the qui tam relator would be an analytical redundancy.
 
 
 11
 Having concluded that the qui tam relators in this case are the proper parties to represent the United States in its suit against these defendants, the only issue remaining is whether the United States, as the real plaintiff, has suffered a sufficient injury for purposes of Article III. There can be no serious question that it has. The amended complaint filed in this case alleges various violations of 25 U.S.C. Secs. 81 and 264. The statutes under which the relators brought this action reflect what has been commonly referred to as "the unique trust relationship between the United States and the Indians." Oneida County, N.Y. v. Oneida Indian Nation of N.Y., 470 U.S. 226, 247, 105 S.Ct. 1245, 1248, 84 L.Ed.2d 169 (1985); United States ex rel. Mosay v. Buffalo Bros. Mgmt, Inc., 20 F.3d 739, 742 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 185, 130 L.Ed.2d 119 (1994). As such, it is the United States, as trustee, who owns the rights conferred by these statutes. And taking as true the allegations contained in the relators' amended complaint, we conclude that the United States has suffered a sufficient injury and therefore has standing to maintain this action through the qui tam relators.
 
 
 12
 There is one final matter. In its order, the Wisconsin District Court did offer one independent reason for its dismissal of this qui tam complaint. According to the court, "[t]he statutes at issue were enacted for the protection of the Indian Tribes and the Plaintiffs are not in the 'zone of interests' protected by the statutes." United States ex rel. Hall, No. 93-C-494 at 2 (E.D.Wis. Sept. 15, 1993). As support for this statement, the court cited to a decision from the Eighth Circuit, Schmit v. International Finance Mgmt. Co., 980 F.2d 498 (8th Cir.1992) (per curiam), as well as a recent decision out of the Tenth Circuit, Western Shoshone Business Council v. Babbitt, 1 F.3d 1052 (10th Cir.1993).
 
 
 13
 By using the phrase "zone of interests," the court was referring to one of the non-constitutional prudential considerations courts may use in determining whether a particular litigant may assert standing. See Lujan, 504 U.S. at ----, 112 S.Ct. at 2136; Valley Forge College, 454 U.S. at 474. The zone of interests test was first articulated in Association of Data Processing Service Organization, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and was formulated to determine whether a would-be challenger to an agency's action is pursuing an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee." Id. at 153, 90 S.Ct. at 83; if so, then the party may be considered to be among the class of persons permitted to obtain judicial review of the agency's action pursuant to Sec. 10 of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 702. The Supreme Court has subsequently indicated that the zone test applies in non-agency contexts as well, such as where the would-be plaintiff points to constitutional violations as the basis of his complaint. E.g., Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 320-21 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) (Commerce Clause violation); see also Clarke v. Securities Industry Ass'n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757-58 n. 16, 93 L.Ed.2d 757 (1987) (noting the applicability of the zone test beyond the context of the APA).
 
 
 14
 However, the Supreme Court has made it clear that prudential considerations, such as the zone of interests test, do not apply where Congress, by legislation, has expressly authorized a particular action by a particular person. E.g., Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206-07, 45 L.Ed.2d 343 (1979). Here, Congress, by enacting these qui tam statutes, has expressly enlisted private parties to act as agents for the government. In other words, these relators are the very persons intended by Congress to maintain these suits. See also 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure Sec. 3531.13 at 76 (1984) ("if Congress wishes, indeed, it can enact a qui tam statute to enable a private party to invoke the standing of the government to collect a civil penalty"). In light of this express legislative authorization, these qui tam relators are the appropriate parties to bring this suit, meaning that the district court "lack[ed] the authority to create [a] prudential barrier to standing." Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); see also Warth, 422 U.S. at 501, 95 S.Ct. at 2206 (stating that as long as the requirements of Article III are satisfied, "persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interest of others").
 
 
 15
 Although unnecessary in light of the preceding discussion, we touch briefly upon the two decisions cited by the Wisconsin District Court in support of its application of the zone of interests test to bar this qui tam action. As to the Tenth Circuit's decision in Western Shoshone Business Council, it appears that the court was addressing a procedurally different creature than the case before us. There, a law firm which had a contract for legal services with the Western Shoshone Indian Tribe brought an action against the Acting Area Director for the Bureau of Indian Affairs, challenging the Director's determination that the contract did not require approval by the Bureau pursuant to 25 U.S.C. Sec. 81. Id. at 1054. Unlike the case before us, this was not a qui tam suit against private defendants, but rather a suit by a private party challenging an administrative determination by the Bureau of Indian Affairs. As such, this decision provides no legal support whatsoever for a determination that these qui tam relators were without standing to prosecute the government's suit against the defendants.
 
 
 16
 The Eighth Circuit's decision in Schmit does address a situation similar to ours. In Schmit, a non-Indian plaintiff invoked Sec. 81 as the basis to void a contract entered into between the Winnebago Tribe and a provider of gaming and casino services. The district court dismissed the plaintiff's complaint[7] for lack of standing. On review, the Eighth Circuit correctly observed that Sec. 81 was enacted " 'solely for the benefit of the Indians.' " Id. at 498 (quoting United States ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Mgmt. Co., 616 F.Supp. 1200, 1208 (D.Minn.1985), appeal dismissed, 789 F.2d 632 (8th Cir.1986)). From this, the court, in a three-paragraph opinion, concluded that Schmit, as a non-Indian, "[was] not within the zone of interest intended to be protected by Sec. 81," id., and on that basis affirmed the district court's dismissal. We note, however, that as authority for its application of the zone of interest test, the Eighth Circuit relied upon two district court decisions, Enterprise Mgmt. Consultants v. United States ex rel. Hodel, 685 F.Supp. 221 (W.D.Okla.1988), aff'd 883 F.2d 890 (10th Cir.1989), and United States ex rel. Shakopee, both of which addressed the same issue that was before the Tenth Circuit in Western Shoshone Business Council--namely, challenges by a non-Indian to a determination by the Bureau of Indian Affairs. See United States ex rel. Hodel, 685 F.Supp. at 222-23; United States ex rel. Shakopee, 616 F.Supp. at 1204, 1207-08. As such, these decisions provide no legal support for the Eighth Circuit's decision to invoke the zone of interests tests as a barrier to a qui tam action under Sec. 81. More importantly, however, is the fact that Congress has explicitly provided for these suits, which according to the Supreme Court in Havens and Warth means that federal courts are without authority to erect prudential barriers to them. Accordingly, we are obligated to follow the Supreme Court's lead, and therefore reject Schmit 's application of the zone of interests test as a basis to bar these qui tam relators from bringing the present action.[8]III.
 
 
 17
 Congress, in enacting these qui tam statutes, has authorized private parties to appoint themselves as the government's prosecutors. Of course, there is a separate question, not raised by either party: how can a private party, appointed by himself rather than the President or the other appointing officers under Article II, Sec. 2 cl. 2 of the Constitution, represent the United States? That question we leave for another day. The reason for that is straightforward. Although our authority to act under Article III carries with it a corresponding duty to monitor our jurisdiction, and hence the obligation to raise and correct jurisdictional matters sua sponte, as the citation above indicates, an Appointments Clause challenge does not involve Article III, but Article II ; hence it is non-jurisdictional, on which see Cass R. Sunstein, What's Standing After Lujan? Of Citizen Suits, "Injuries, " and Article III, 91 Mich.L.Rev. 163, 213 (1992) (remarking that "the conflation of Article II and Article III concerns [leads] to serious confusion.... The two articles raise quite different concerns; they should be analyzed separately."). That being the case, we no more have an obligation to take notice of and address potential Article II problems than we do to raise other non-jurisdictional, constitutional violations contained in the record but not raised by either party. See Wallace v. Duckworth, 778 F.2d 1215, 1219 n. 1 (7th Cir.1985) (noting that courts have no duty sua sponte to raise nonjurisdictional issues). But as far as the actual issue before us, we conclude that Congress has authorized these qui tam relators to act on behalf of and in the name of the United States, which means that they are able to invoke the standing of the United States for purposes of satisfying Article III. Consequently, we REVERSE the district court's dismissal of the relators' complaint for lack of standing, and REMAND this action to the district court where it can proceed to the merits.
 
 
 18
 FLAUM, Circuit Judge, concurring.
 
 
 19
 I agree that Supreme Court jurisprudence dictates that the plaintiffs' qui tam action satisfies both constitutional and prudential standing requirements and that this action should be remanded with instructions to proceed on the merits of the case. I nonetheless write separately to discuss two related issues not directly addressed in the majority opinion.
 
 
 20
 First, the Minnesota District Court's opinion in United States ex rel. Hall, 825 F.Supp. 1422 (D.Minn.1993), upon which the district court in this case relied, separately concluded that dismissal was appropriate under FED.R.CIV.P. 19 because of an inability to join necessary and indispensable parties--namely, the Indian tribes who are parties to the agreements in question. But see United States ex rel. Gulbronson v. D & J Enterprises, No. 93-C-233-C (W.D.Wis. Dec. 22, 1993) (concluding that an Indian tribe was not a necessary and indispensable party in a qui tam action brought by members of the tribe challenging contracts involving gaming-related goods and services); United States ex rel. Mosay v. Buffalo Brothers Management, Inc., No. 92-C-925-S, 1993 WL 643378 (W.D.Wis. Mar. 16, 1993) (same), aff'd, 20 F.3d 739 (7th Cir.1994). It is unclear from the district court's orders of August 6 and September 15, 1993, whether the court adopted the Minnesota opinion in its entirety or simply adopted its holding that a lack of standing deprived the court of subject matter jurisdiction over the case. In any event, "[t]he application of Rule 19, of course, turns on the facts of each case," LeBeau v. Libby-Owens Ford Co., 484 F.2d 798, 800 (7th Cir.1973), and thus is a task better suited, at least in the first instance, to the district court. Accordingly, on remand I would direct the district court to apply independently the relevant Rule 19 factors to the particular circumstances of this case.
 
 
 21
 Second, even if the plaintiffs have standing to assert claims under Secs. 81 and 201, we must still determine whether these sections provide the remedies that plaintiffs hope they do because dismissal would be proper if they do not. According to the plaintiffs, the qui tam provision of Sec. 81 is self-contained in the sense that it allows recovery for the substantive violations of that very section--contracts for services relating to lands made without the approval of federal authorities. Section 201, on the other hand, purports to authorize all actions to collect any and all penalties "which shall accrue under this title." Accordingly, plaintiffs insist that Sec. 201 allows them to enforce the substantive obligations imposed by Secs. 81, 264, and 2711.
 
 
 22
 In my view, plaintiffs clearly are entitled to proceed with their claims seeking to enforce alleged violations of Secs. 81 and 264. Whether there was a violation of Sec. 81 in this case depends on whether the contracts at issue fall within the purview of that statute. At this stage of the litigation, it would be inappropriate (and perhaps impossible) for us to decide that question here. However, unless the provisions of the contract are ambiguous, thereby raising a question of fact, a district court may consider the applicability of Sec. 81 to be a question of law appropriate for resolution at summary judgment according to the standard set forth in Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 811 (7th Cir.1993). Accordingly, I would remand with instructions to determine whether the contracts underlying the plaintiffs' suit involve payment "in consideration of services for ... Indians relative to their lands." 25 U.S.C. Sec. 81. In addition, I would allow the plaintiffs to pursue their claim that the defendants have violated the Indian Traders Licensing Act, 25 U.S.C. Sec. 264,[1] by virtue of their having standing under Sec. 201. Sections 201 and 264 existed within the same title (Title XVIII of the Revised Statutes) of the federal statutes as early as 1834, and since that time both have been recodified under Title 25 of the United States Code. The historical linkage between these two sections suffices to establish that a penalty imposed under Sec. 264 may be recovered in a suit brought pursuant to Sec. 201, though the case law from other circuits indicates that plaintiffs' potential recovery may be limited. See, e.g., United States ex rel. Hornell v. One 1976 Chevrolet, 585 F.2d 978, 981 (10th Cir.1978) (holding that a forfeiture of merchandise under Sec. 264 is not a "penalty" as that term is used in Sec. 201 and thus cannot be recovered by a qui tam litigant proceeding under that section).
 
 
 23
 The most difficult issue raised in this case, in my view, is whether either Sec. 81 or Sec. 201 applies to the plaintiffs' claims to recover for violations of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. Sec. 2701 et seq.[2] Mosay expresses doubt that Sec. 81 applies to contracts now governed by the IGRA for the following reasons:
 
 
 24
 Contractors would be subject to enormous legal risk that one of their contracts with an Indian tribe might be held to be a collateral agreement that they should have but failed to file, in which event they would have to repay everything received under the contract. Qui tam liability would expand indefinitely at the very moment that Congress had created a new administrative remedy and vested its enforcement in a new, specialized agency with its own detailed, measured, modern set of remedies.
 
 
 25
 Mosay, 20 F.3d at 743. Here plaintiffs allege standing under Sec. 201. If we actually had to resolve this issue, we might start by considering, in addition to the concerns noted by the Mosay court, whether a penalty assessed under the IGRA may be considered to have accrued within the same title as Sec. 201. We would have to decide whether the relevant "title" is Title XVIII of the Revised Statutes of 1834 or Title 25 of the United States Code as of the day this action was filed. We also would have to consider whether the language of the IGRA limits the authority to levy and collect fines to one (and only one) person--namely, the Chair of the Commission.
 
 
 26
 I would leave these difficult questions unresolved today because we cannot even be certain at this stage of the litigation that the IGRA even applies to the contracts at issue here. In Mosay we read the language of the IGRA regulatory scheme as directing that the old regime under Sec. 81 would continue to operate until the Commission was "up and running," and we therefore concluded that qui tam liability for failure to comply with the IGRA did not exist during the limbo period between the date on which the Commission was "established" by the new Act (October 17, 1988) and the date on which the Commission was actually operating. See 20 F.3d at 743; see also S.REP. NO. 446, 100th Cong., 2d Sess. at 1, 17, (1978), reprinted in 1988 U.S.C.C.A.N. 3071, 3087 (noting that Section 10 of P.L. 100-497, codified at 25 U.S.C. Sec. 2709, requires the Secretary of the Interior to exercise continuing authority over Indian Gaming until the Commission is "in place"). Thus, following the reasoning of Mosay, plaintiffs here surely cannot establish a violation of the IGRA if the Commission was not yet in operation on the date that the plaintiffs filed this lawsuit challenging then-existing contracts. Mosay does not tell us precisely when the Commission was operating--it simply notes that almost five years elapsed between the relevant dates. 20 F.3d at 743. My research indicates that the Commission proposed regulations for, among other things, submitting gaming ordinances to the Chairman for approval on July 8, 1992. It subsequently published the final rules on January 22, 1993, see Fed.Reg. 5810 (1993), to take effect exactly one month later. See 25 C.F.R. 501 et seq. Apparently, then, the earliest date on which the Commission could be considered to have been operating is February 22, 1993. On the record before us, all we know is that the plaintiffs commenced this action on December 3, 1992, in the District of Minnesota and, after the matter was transferred to the Eastern District of Wisconsin, filed an Amended Complaint on May 14, 1993. We do not know, however, whether all of the relevant contracts were entered into prior to February 22, 1993, in which case they would not be governed by the new IGRA regime. To be sure, contracts pre-dating the IGRA still may fall within the authority of the Secretary of the Interior and/or the Commissioner of Indian Affairs under the old regime (a question we also cannot answer on the limited record before us), but there can be no violation of the IGRA because, in any event, the Secretary was not required to exercise his authority in accordance with the substantive criteria of the new law at the time the relevant contracts were made. See Mosay, 20 F.3d at 744. Accordingly, I would remand the claims under Sec. 201 alleging a violation of the IGRA for an initial determination of whether the IGRA even applies to the contracts at issue here. If the IGRA does not apply, the plaintiffs' claim would have to be dismissed; if it does apply, the district court would need to resolve on the merits whether the new statute can be enforced through an action in qui tam, an issue on which I express no view at this time.
 
 
 27
 The qui tam action in the present case reflects the paternalistic concern of a bygone era over Native Americans and their ability to contract. Whether, as a policy matter, such actions actually prevent fraudulent agreements or instead prove vexatious to the very interests they are designed to serve may well be open to debate, but that is an argument for another forum: namely, Congress. For the foregoing reasons, I agree that the plaintiffs in this case have standing and that the case should be remanded for further proceedings.
 
 
 
 *
 Hon. Thomas J. Meskill, of the Second Circuit, sitting by designation
 
 
 [1]
 The relevant portion of that statute provides:
 No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, ... in consideration of services for said Indians relative to their lands, ... unless such contract or agreement be executed and approved as follows:
 ....
 Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
 ....
 All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services, in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe or for whom it was so paid.
 25 U.S.C. Sec. 81.
 
 
 [2]
 "Qui tam" is short for "qui tam pro domino rege quam pro se imposo sequitur," which in English means "who brings the action as well for the king as for himself." United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 746 n. 3 (9th Cir.1993) (quoting Bass Anglers Sportsman's Soc'y of America v. U.S. Plywood-Champion Papers, Inc., 324 F.Supp. 302, 305 (S.D.Tex.1971)), cert. denied, --- U.S. ----, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994)
 
 
 [3]
 The relevant part of that section provides:
 Any person other than an Indian of the full blood who shall attempt to ... introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500[.]
 25 U.S.C. Sec. 264.
 
 
 [4]
 This provision provides:
 All penalties which shall accrue under this title shall be sued for and recovered in an action in the nature of an action of debt, in the name of the United States, before any court having jurisdiction of the same, in any State or Territory in which the defendant shall be arrested or found, the one half to the use of the informer and the other half to the use of the United States except when the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use.
 25 U.S.C. Sec. 201. The "title" referred to in Sec. 201 is an 1834 statute known as Title XVIII of the Revised Statutes. Many of these have since been repealed; others, including section 264, have been recodified in various sections under Title 25 of the United States Code.
 
 
 [5]
 Simply incorporating another court's disposition of a related case does not complete the process. Circuit Rule 50 requires that district courts set forth their reasons for dismissal. Among other things, adherence to this rule provides the parties and the reviewing courts with the reasons for the district court's judgment. See DiLeo v. Ernst & Young, 901 F.2d 624, 626 (7th Cir.), cert. denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)
 
 
 [6]
 Contrast this with the typical citizens' suit provision such as the one at issue in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), which provided, in pertinent part, that " 'any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter.' " Lujan, 504 U.S. at 571-72, 112 S.Ct. at 2142 (quoting 16 U.S.C. Sec. 1540(g)) (emphasis added). Under the language of Sec. 1540(g), the plaintiff brings this suit on his own behalf, and not for the government, which explains why the Court in Lujan regarded the Defenders plaintiffs as the true plaintiffs for purposes of Article III
 
 
 [7]
 For reasons not explained in the Eighth Circuit's opinion, the plaintiff's complaint was filed in her individual name and not as a qui tam relator on behalf of the government
 
 
 [8]
 This opinion was circulated before release to all judges in active service pursuant to Circuit Rule 40(f). No judge favored hearing this case en banc
 
 
 [1]
 That section provides in relevant part:
 Any person other than an Indian of the full blood who shall attempt to ... introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500.
 25 U.S.C. Sec. 264.
 
 
 [2]
 As we observed in Mosay, Congress has established "two distinct, successive regulatory regimes" to oversee certain contracts made with Indians. The traditional regime, administered by the Bureau of Indian Affairs under Sec. 81, recently has been supplemented (and in some respects supplanted) by the IGRA. The IGRA carves out a defined class of contracts--casino management contracts, including "all collateral agreements to [management] contract[s] that relate to the gaming activity"--that are subjected to the authority of the newly created National Indian Gaming Commission ("NIGC"), a three-member independent agency within the Department of the Interior, see 25 U.S.C. Sec. 2711. The Commission's grant of authority includes the levying and collection of civil fines of up to $25,000 for violations of the Act, regulations issued under it, or tribal ordinances or resolutions adopted under it. 25 U.S.C. Sec. 2713(a)(1). In addition, the Commission is required to review all contracts adopted prior to October 17, 1988, the day the Act was passed, and to issue orders bringing non-conforming contracts into line with the new statute. 25 U.S.C. Sec. 2712. Contracts that "relate to Indian lands" but do not fall within the scope of the IGRA still require BIA approval, and "failure to submit exposes the contractor to the fell sanction of a qui tam suit." Mosay, 20 F.3d at 743