**UNITED STATES of America ex rel. Brett ROBY, Plaintiff,**

v.

**The BOEING COMPANY, Defendant.**

No. C–1–95–375.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 11, 1998.

Michael F. Hertz, Dennis Phillips, Sara Winslow, Alicia Bentley, U.S. Department of Justice, Civil Division, Washington, DC, for U.S.

James Burdette Helmer, Jr., Frederick M. Morgan, Jr., Jennifer M. Verkamp, Helmer, Lugbill, Martins & Neff, Cincinnati, OH, for Brett Roby.

Jerome Charles Randolph, Keating, Muething & Klekamp, Cincinnati, OH, Mitchell S. Ettinger, Bonnie J. Austin, Martin T. Moe, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for Boeing Company.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Motion To Limit Relator (doc. 78), to which Relator and the United States responded (docs. 84 & 85), and Defendant replied (doc. 92); Defendant's Motion to Dismiss Relator (doc. 96), to which Relator and the United States responded (docs. 99 & 100), and Defendant replied (doc. 104); and, Defendant's Objection To The Magistrate Judge's Order Granting In Part And Denying In Part Relator's First Motion To Compel Production Of Documents From Defendant Boeing (doc. 87), to which Relator and the United States responded (docs. 93 & 94).

## BACKGROUND

On May 22, 1995, Relator Brett Roby filed this action under seal with the United States District Court for the Southern District of Ohio. Relator claims that the Boeing Corporation ("Boeing") and its supplier, Speco Corporation ("Speco"), violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, (the "FCA"), by manufacturing and selling defective transmission gears to the United States via Boeing's VH–47(D) Chinook Army helicopters. Speco manufactured the allegedly defective gears at its Springfield, Ohio facility. The gears were then installed by Boeing in the CH–47(D) Chinook Army helicopters. Although an original party to this action, Speco filed for bankruptcy, settled with the United States and Relator, and was dismissed from the case.

On April 30, 1997, the United States intervened and filed an Amended Complaint against Boeing. The Amended Complaint was unsealed on May 1, 1997. Subsequently, Relator served Boeing with a number of discovery requests for the production of documents pursuant to Federal Rule of Civil Procedure 34. However, Boeing declined to produce any documents until all issues pertaining to the scope of discovery were resolved. On August 16, 1997, Relator filed a motion to compel the production of documents (doc. 46), to which Boeing responded (doc. 53). On September 22, 1997, Boeing filed a motion to limit Relator's participation in this action. On September 30, 1997, the

Magistrate Judge held a hearing on the matter, granting in part and denying in part Relator's motion to compel documents (doc. 81, October 7, 1997 Order). Boeing filed an objection to the Magistrate Judge's Order. Also, Boeing filed a motion to dismiss Relator from this action for lack of standing on November 26, 1997. Both motions and the objection were responded to by Relator and the United States Government in separate briefs. The Court heard oral arguments on these motions on January 23, 1998.

## ANALYSIS

### I. BOEING'S MOTION TO DISMISS RELATOR FROM THIS ACTION

#### A. The False Claims Act

Under the FCA, any person who knowingly submits a false claim for payment to the Government is liable to the United States for a civil penalty plus treble damages. 31 U.S.C. § 3729 *et seq.* First, the FCA provides for the Attorney General to bring such an action against the person who allegedly defrauded the United States. *Id.* § 3730(a). Secondly, the FCA authorizes private citizens to bring actions for violations on the behalf of the United States. *Id.* § 3730(b)(1). The private citizen who brings the action on behalf of the United States is considered the *"qui tam* plaintiff"[1] or the "relator." The relator's complaint is filed under seal *in camera* and "[a] copy of the complaint and written disclosure of substantially all material evidence and information" is served only to the United States, not the defendant. *Id.* § 3730(b)(2). The complaint remains under seal for sixty days. *Id.* § 3730(b)(2). While under seal, the Government has the right to either intervene and prosecute the action or allow the relator to proceed with the suit as the primary party. *Id.* § 3730(b)(4)(A), (B). The Government's intervention into the suit does not preclude the relator from remaining in the litigation. The relator may still continue as a party to the action, however, the Government is not bound by the relator's acts. *See id.* § 3730(c)(1).

For initiating and prosecuting the case, the relator receives a certain percentage of the recovery award. *Id.* § 3730(d). The percentage of the award the relator receives is determined by whether the Government intervened in the action or declined to intervene requiring the relator to proceed as the primary party. If the Government intervenes, the relator receives between 15 percent and 25 percent of the amount recovered. *Id.* § 3730(d)(1). On the other hand, if the Government declines to intervene, the relator receives 25 percent to 30 percent of the recovery. *Id.* § 3730(d)(2). In this matter, the Government has chosen to intervene, however, the relator contends that he remains a party to the litigation.

#### B. Standing Of The *Qui Tam* Plaintiff

Article III, section 2 of the United States Constitution confines the power of federal courts to the adjudication of "[c]ases" and "[c]ontroversies" in which the plaintiff has standing to maintain the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *United States ex rel. Burch v. Piqua Eng'g Inc.,* 803 F.Supp. 115, 118 (S.D.Ohio 1992) (citing *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). To establish standing under Article III, a plaintiff must show an actual or threatened injury resulting from the defendant's conduct that is redressible by the court. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The injury must be concrete to ensure that the litigant has a personal stake in the outcome of the litigation. *United States ex rel. Truong v. Northrop Corp.,* 728 F.Supp. 615, 617 (C.D.Cal.1989). Although Congress may not waive the constitutional minimum of injury-in-fact, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 487–488 n. 24, 102 S.Ct. 752, 70 L.Ed.2d 700, Congress may confer standing upon the plaintiff statutorily. *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 208–209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

---

**1.** *Qui tam* is short for *"qui tam pro domino rege quam pro se imposo sequitur,"* which means he "who brings the action for the king as for himself." *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 746 n. 3 (9th Cir.1993) (citation omitted).

In *qui tam* actions, courts have acknowledged a number of distinct rationales for which the relator satisfies the standing requirement. First, courts recognize that Congress may confer standing on the relator based on the fact that the relator has a personal stake in the outcome of the controversy.[2] *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir.1993) (stating "[b]ecause the *qui tam* relator: (1) funds the prosecution of the FCA suit, (2) will receive a private share in the government's recovery only upon prevailing, and (3) may be liable for costs if the suit is frivolous, the relator's personal stake in the case is sufficiently ensured."); *United States Dept. of Housing and Urban Dev. ex rel. Givler v. Smith*, 775 F.Supp. 172, 180 (E.D.Pa.1991) (acknowledging that a relator's personal interest in the outcome in the litigation, the relator is considered to have "a sufficient stake to ensure the genuine adverseness of the litigation.") (citing *Flast*, 392 U.S. at 99); *United States ex rel. Stillwell v. Hughes Helicopters, Inc.*, 714 F.Supp. 1084, 1097–99 (C.D.Cal. 1989) (recognizing that the statutory bounty is sufficient to give the relator a personal stake in the outcome). The second rationale courts apply is that the relator suffers an actual or threatened injury-in-fact due to the relator's knowledge of the fraud against the Government and the likelihood of employer retaliation for initiating an action under the FCA. *See Burch*, 803 F.Supp. at 119 (finding that the plaintiffs had standing based "upon the potential ramifications to their employ-ment status by initiating an action under the FCA."); *Stillwell*, 714 F.Supp. at 1099 (indicating that the threat to the relator's present or future job security may demonstrate an actual or threatened injury-in-fact.).[3] The third rationale that courts recognize is the significant historical importance of the *qui tam* mechanism of the FCA. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (stating that *qui tam* actions "have been frequently permitted by legislative action, and have not been without defense by the courts."); *Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 50 L.Ed. 157 (1905) (opining that "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by the statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of the Government."); *Givler*, 775 F.Supp. at 181 (declaring that "[w]hen considering *qui tam* statutes, the Court has never questioned the standing of the relator involved."); *Stillwell*, 714 F.Supp. at 1097 (stating "[t]he Act's statutory grant of standing has been consistently validated by the federal courts.") (citations omitted); *cf. Truong*, 728 F.Supp. at 618 (stating that "the fact that *qui tam* statutes date back to the time of the First Congress is not independent evidence of their constitutionality.").[4] Finally, courts consider that relators possess standing because they are pursuing claims on behalf of the government for injuries suffered by the government, not necessarily for injuries inflicted personally upon them.[5] *See, e.g., United States ex rel. Berge*

---

2. *But see Burch*, 803 F.Supp. at 118.

3. Note also *United States ex rel. Grand v. Northrop Corp.*, 811 F.Supp. 333, 336 (S.D.Ohio 1992) (although discussing whether the statute of limitations for *qui tam* actions applied to retaliatory discharge claims under the FCA, the Court indicated that relator's *qui tam* claim is often interrelated to his claim for retaliation.)

4. Although *Truong* rejected the historical analysis of the constitutional adequacy of standing in *qui tam* actions, we recognize that the long history of the FCA is probative of the fact that courts have had ample opportunity to invalidate the FCA. *Burch*, 803 F.Supp. at 117 n. 2 (citing *United States ex rel Rudd v. Gen. Contractors, Inc.*, No. C–89–397–RJM, 4, 1990 WL 455191 (E.D.Wash. Dec. 4, 1990)).

5. We reject Defendant Boeing's assertion that we should follow the reasoning of *United States ex rel. Riley v. St. Luke's Episcopal Hospital*, 982 F.Supp. 1261, 1262 (S.D.Tex.1997), which concluded that Congress cannot confer standing on a *qui tam* plaintiff who himself has suffered no cognizable injury, but brings the action for injuries suffered by the United States. Moreover, we find the decision reached by the court in *Riley* unpersuasive guidance in light of the decisions reached by other courts concerning the *qui tam* provisions of the FCA. We note that the court in *Riley* failed to properly follow its own circuit precedent in *United States ex rel. Weinberger v. Equifax*, 557 F.2d 456 (1977), which acknowledged that Congress "specifically provides for informer's suits." *Id.* at 460; *see also, Hopkins v. Actions, Inc. of Brazoria County*, No. CIV.A. G–97–553, 985 F.Supp. 706, 1997 WL 789429, at *3

*v. Bd. of Trustees of the Univ. of Alabama,* 104 F.3d 1453, 1457–58 (4th Cir.1997) (opining that so long as the government has suffered an injury-in-fact, the *qui tam* plaintiff possesses general standing as the government's representative); *United States ex rel. Hall v. Tribal Dev. Corp.,* 49 F.3d 1208, 1212–1214 (7th Cir.1995) (stating "[o]nce we accept the premise that the United States is the real plaintiff in a *qui tam* action, it stands to reason that challenges to the standing of the government's representative are beside the point.... Requiring an additional showing of injury on the part of the *qui tam* relator would be an analytical redundancy."); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993) (holding that "the FCA effectively assigns the government's claims to *qui tam* plaintiffs ..., who then may sue based upon an injury to the federal treasury."); *Kreindler,* 985 F.2d at 1154 (declaring that "[i]n a *qui tam* action, the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury."); *United States ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 49 (4th Cir.1992) (noting that "the government, and not the relator, must have suffered the injury-in-fact required for Article III."); *Stillwell,* 714 F.Supp. at 1097–99 (enunciating that "[t]he [FCA] essentially creates a legislative fiat, a *de facto* assignment of a portion of the government's interest in the action."); *Givler,* 775 F.Supp. at 181 (indicating that "[t]he relator who has received the government's right to litigate through assignment, also has a personal stake in the litigation by virtue of the statutory bounty."); *Truong,* 728 F.Supp. at 620 (stating that *qui tam* actions involve "a concrete, identifiable claim for fraud against the government the prosecution of which Congress, pursuant to its policy-making authority, has placed under the direction of the *qui tam* relator."); *Public Interest Bounty Hunters v. Bd. of Governors,* 548 F.Supp. 157, 161 (N.D.Ga.1982) ("The central purpose of statutes authorizing *qui tam* actions, is to provide a private citizen who would otherwise have no judicially cognizable 'interest' in rights protected by particular federal substantive provisions with an interest sufficient to give that individual standing to sue to enforce these provisions.").

■ In this case, Boeing does not argue that the *qui tam* provisions of the FCA are unconstitutional, rather that Relator has not suffered an actual injury-in-fact by Boeing to satisfy the standing requirement of Article III. Although Relator's termination does constitute a cognizable injury, Boeing contends that Relator's injury stems from his employment with Speco, not Boeing. Boeing asserts that Speco is no longer a defendant in this action, having been dismissed after the company filed for Chapter 11 bankruptcy and settling its liability with the United States Government. Therefore, Boeing argues that Relator should now be dismissed in this action. To the contrary, the Government argues that Relator's action is a case or controversy within the meaning of Article III of the Constitution and that a *qui tam* relator need not demonstrate that he personally was injured by the fraudulent conduct of the defendant. Moreover, the Government contends that Relator has standing because he possessed information necessary for the allegation of fraud on the United States to be brought forward under the FCA. The Government contends that "[t]he *qui tam* mechanism is analogous to the assignment of a chose in action, an arrangement that permits an assignee who has himself suffered no injury from the defendant's conduct to sue anyway based upon the injury to the assignor." (*See* Government's Mem. Opp., at 11.) Relator argues that he brought this action only after he learned that Speco and Boeing were manufacturing and selling defective gears to the United States Government in their CH–47(D) Chinook Army helicopters. Relator contends that he suffered an injury-in-fact because he was subsequently fired from him job and has faced belittling comments by Boeing in the media. Thus, Relator asserts that he has standing to bring this action, and that to deny him the ability to do so would be tantamount to striking down the FCA's *qui tam* provisions.

(S.D.Tex. Dec.19, 1997) (rejecting its sister court's reasoning in *Riley* "[i]n light of the congressional purpose underlying the FCA and its plain language.").

Reviewing the arguments asserted by the Parties, we conclude that Relator faced severe employment ramifications as a result of filing this action against Defendants Speco and Boeing under the FCA. *See Burch*, 803 F.Supp. at 119 (finding that the *qui tam* plaintiffs suffered an actual injury-in-fact when two of the plaintiffs were fired from their jobs and the third plaintiff was laid off.). The employment repercussions Relator faced not only stem from his knowledge of the alleged fraud committed by Speco, but by Boeing as well. It is irrelevant that Speco has settled and been dismissed from this action. If a relator suffers loss of standing due to his employer settling and then being subsequently dismissed from the action, co-defendants would ultimately eschew liability simply on the settlement of the co-defendant employer of the relator.

Even assuming that the employment ramifications Relator faces are insufficient to create an injury-in-fact, Relator properly filed this action against both Defendants Speco and Boeing on the behalf of the United States Government for alleged fraud committed against the Government, not solely on his own behalf.[6] We acknowledge that courts have affirmed that a *qui tam* plaintiff has standing to pursue claims on behalf of the government for injuries suffered by the government. *Berge*, 104 F.3d at 1457; *Hall*, 49 F.3d at 1212–1214; *Kelly*, 9 F.3d at 748; *Kreindler*, 985 F.2d at 1154; *Milam*, 961 F.2d at 49; *Stillwell*, 714 F.Supp. at 1097–1099; *Givler*, 775 F.Supp. at 181.

In light of the present landscape of the courts' decisions surrounding standing under the *qui tam* provisions of the FCA, we conclude that Relator does satisfy the standing requirements under Article III to bring this action against Boeing. Accordingly, Boeing's motion to dismiss is hereby DENIED.

## II. Boeing's Motion To Limit Relator

Additionally, Boeing asks this Court to limit Relator's participation in these proceedings on the grounds that Relator's conduct constitutes an undue burden and causes Boeing to incur unnecessary expenses. Also, Boeing asserts that Relator's conduct is harassing and prevents Boeing in its efforts to effectively and efficiently litigate this action. Boeing contends that Relator is pursuing separate discovery, responds separately to each of the pleadings, and asserts separate theories than the Government. Contrarily, the Government argues that it is "extremely satisfied" with Relator's role in this action and that Relator is not pursuing independent theories. Moreover, the Government contends that Relator is pursuing what Boeing knew about the allegedly defective gears. Relator submits that even though he is no longer the primary plaintiff in this action, he is still a party for the purposes of this litigation. Relator asserts that he is not pursuing separate theories, rather looking into separate facts surrounding this litigation.

Congress enacted the FCA in 1863 to deal with fraud against the United States committed by defense contractors during the Civil War. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 8–10 (1986), reprinted in U.S.C.C.A.N. 5266, 5273–75. At the time, the FCA's *qui tam* provisions allowed any person to prosecute a claim on behalf of the United States against any person who knowingly submitted a false claim to the government. *Id.* at 5275. If the relator was successful, the relator was entitled to one-half of the amount the government recovered. *See* Act of March 2, 1863, Ch. 67, 12 Stat. 696. In 1943, Congress amended the FCA in a manner that significantly "weakened the effectiveness for the *qui tam* legislation." *See* Kenneth D. Broody, Recent Developments in the Area of

---

**6.** This is the difference between *qui tam* suits and typical citizen suits, such as the one at issue in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Recognizing that the language in 16 U.S.C. § 1540(g) provided for the initiation of citizen suits, the Court in *Lujan* reversed the appellate court's decision on the grounds that the third parties were the true plaintiffs to the action and that the respondents lacked a cognizable injury-in-fact to establish standing under Article III. *Lujan*, 504

U.S. at 571–78. In writing for the Court, Justice Scalia implicitly distinguished the citizen suit in *Lujan* from that of a *qui tam* action, enunciating that the action in *Lujan* was not "the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the Government's benefit, by providing a cash bounty for the victorious plaintiff." *Id.* at 572–73; *see also Givler*, 775 F.Supp. at 175 n. 4

"Qui Tam" Lawsuits: A New Weapon For Challenging Those Who May Be Submitting False Claims To The Government, 37 FED.B. NEWS & J. 592, 593 (1990). For instance, the *qui tam* plaintiff: 1) was not guaranteed a percentage of the recovery; 2) faced a jurisdictional bar if the government possessed the information alleged in the *qui tam* case—even if the government had not undertaken any action to investigate or prosecute the case; 3) had no right to play an active role as a party to the litigation; 4) had no right to recover reasonable attorneys' fees; and, 5) was not provided protection in his employment status. Thus, the 1943 amendments served to deter private enforcement suits under the FCA.

In 1986, Congress amended the FCA's limitations placed on the *qui tam* plaintiff in his role in the litiqation.[7] The Senate Report to the 1986 Amendments to the FCA, makes it clear that "[t]he Committee's overall intent in amending the *qui tam* section of the False Claims Act is to encourage more private enforcement suits." S.Rep. No. 345, 99th Cong., 2d Sess. 23–24 (1986), reprinted in U.S.C.C.A.N 5266, 5288–5289. Likewise, the House Report emphasizes that "[t]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." H.R.Rep. 660, 99th Cong., 2d Sess. 23 (1986). Pursuant to the 1986 amendments, once the Government intervenes in the action, the Government has primary authority to prosecute the litigation and the relator becomes "subject to a host of controls designed to permit the reassertion of executive litigative authority." *Stillwell*, 714 F.Supp. at 1091. Although subject to

controls, the relator still remains a party to the suit—the Government is simply not bound by any act of the relator. 31 U.S.C. § 3730(c)(1); *Stillwell*, 714 F.Supp. at 1091. The relator is given "unrestricted participation" in the litigation, subject to a request for limitation by the Government or the defendant on a showing of delay, interference, harassment, or undue burden. 31 U.S.C. §§ 3730(c)(2)(C)(iv), 3730(c)(2)(D).

Examining the *qui tam* provisions of the FCA in light of the 1986 amendments, we find Relator may participate in this litigation in the manner that he is proceeding. Moreover, Relator does not appear to be pursuing a separate theory, rather determining whether separate facts exists.[8] We conclude that Relator remains a party to this litigation and that Boeing's evidence does not sufficiently show Relator is engaged in any inappropriate tactics to cause delay, burden, or harass Boeing. Accordingly, Boeing's motion to limit Relator in these proceedings is DENIED.

### III. Boeing's Objection To Magistrate Judge's Granting In Part and Denying In Part Relator's First Motion To Compel Production of Documents

Having reached the conclusion that Boeing's motion to limit Relator is without merit, we find that Boeing's objection to the Magistrate Judge's October 7, 1997 Order is also without merit. Accordingly, Boeing's objection to the Magistrate Judge's Order is hereby OVERRULED.

### CONCLUSION

It is this Court's belief that Relator has standing under Article III of the United

---

7. We recognize that the limitations placed on the *qui tam* plaintiff by the 1943 amendments were changed such that the relator: 1) is guaranteed a minimum of 15 percent of the recovery. 31 U.S.C. § 3730(d); 2) is not precluded from initiating an action unless the information has already been publicly disclosed and the relator is not the original source of the information. *Id.* § 3730(e)(4); 3) remains a party to the has a right to object to a court settlement proposed by the government. *Id.* § 3730(c); 4) may recover attorneys' fees from defendant. *Id.* § 3730(d); and, 5) protected from any form of employer retaliation for furtherance of the action. *Id.* § 3730(h).

8. Note *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 964 n. 8 (9th Cir.1995) (citing Senate Report No. 345, 99th Cong.2d Sess. 25–26 (1986) reprinted in 1986 U.S.C.C.A.N. at 5290–91 which indicated that "[p]roviding the relator a right to recover, a role in the action when the government intervenes ..., and a right to object to dismissal or settlement by the government ..., also serve[s] the additional purpose of giving the relator the incentive *to 'act [ ] as a check that the government does not neglect evidence, cause undu[e] delay, or drop the false claim case without legitimate reasons.' "*) (internal citations omitted) (emphasis added).

States Constitution and has not caused delay, harassment, or an undue burden in these proceedings. Accordingly, Boeing's motion to dismiss the relator is DENIED; Boeing's motion to limit the relator in these proceedings is DENIED; and, Boeing's objection to the Magistrate Judge's October 7, 1997 is OVERRULED.

SO ORDERED.