**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jerome J. SCHOENBORN, Defendant–Appellant.**

**No. 86–5486 MN.**

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1987.

Decided Nov. 7, 1988.

Gregory A. Fontaine, Minneapolis, Minn., for defendant-appellant.

Mary E. Carlson, Minneapolis, Minn., for plaintiff-appellee.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and FAIRCHILD,[*] Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The United States brought suit seeking restoration of wetlands covered by an easement in its favor on the property of Jerome Schoenborn (Jerome) and an injunction against further violations.[1] The district court granted relief to the government.[2] Schoenborn appeals.

## I. FACTS

On January 26, 1965, Benjamin Lukes, a United States Fish and Wildlife Service (FWS) employee, visited the Schoenborn farm (then owned by Jerome's father, Edward) to obtain an easement for waterfowl management rights. Lukes and Ed Schoenborn walked the property and discussed the proposed easement. Lukes wanted an easement covering the entire 360 acre farm and offered $1,700. Mr. Schoenborn refused. Ultimately they agreed on a less comprehensive easement, the extent of which is now in dispute, and a price of $1,000.

Lukes returned the next day with an indenture for conveyance of an easement. The form provided for payment of $1,000 and described the entire farm, but excepted ditches and wetlands "shown on a map certified by the Regional Director at the time of acceptance." A map showing deletions was not then attached. Ed and Martha Schoenborn signed the indenture, which allowed the United States six months for acceptance.

The easement agreement read in pertinent part as follows:

[T]he parties of the first part [the Schoenborns] hereby convey to the United States, commencing with the acceptance of the indenture ... an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity, including the right of access thereto....

. . . . .

*United States v. Albrecht,* 496 F.2d 906, 910 (8th Cir.1974).

---

[*] The Honorable Thomas E. Fairchild, Senior United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit sitting by designation.

1. The authority to provide for acquisition of wetlands easements for waterfowl production areas is derived from 16 U.S.C. § 718d(c). *See*

2. The Honorable Edward J. Devitt, United States District Judge for the District of Minnesota.

[The Schoenborns], for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, ... of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part [of the land] on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes, and by not burning any areas covered with marsh vegetation.... Excepted are certain drainage ditches which [the Schoenborns] may maintain and/or wetlands which are deleted from the provisions of this easement. The above exceptions are shown on a map certified by the Regional Director at the time of acceptance.

The importance of the accuracy of the map to be later attached must have been clear. In a letter dated April 28, 1965 and mailed April 30, the FWS Regional Director informed the Schoenborns that the easement had been accepted and was being recorded. The letter also stated that a copy of the drainage facility map was enclosed, that they should check the map carefully, and inform FWS immediately of any errors. The letter stated that acceptance of the easement payment, which was to arrive after completion of recording, would be considered an endorsement of the accuracy of the map. Ed and Martha testified that they did not examine the map, but when the check arrived, they cashed it and returned a receipt for $1,000 on May 17, 1965.

The dispute over the extent of the easement arises as follows:

There are over 60 ponds or potholes of varying sizes (sometimes referred to as basins) scattered over the 360 acre Schoenborn farm. Much of the farm was wooded. Ed Schoenborn testified that he agreed with Lukes (orally) to an easement covering only five basins in wooded areas, three in the northeastern and two in the west central portions of the farm. The map attached to the indenture excepted only four basins and related ditches, all in cultivated portions of the farm. Thus a number of basins were not excepted and some of them lie in cultivated portions of the farm. Because the indenture included the entire farm, but described specific exceptions, a very much larger number of basins and ditches would have to have been excepted in order to limit the easement to the five basins Mr. Schoenborn said he agreed to.

Lukes did not recall his conversations with Schoenborn, but testified to his standard practice, and that he had no reason to believe he deviated from it. Assuming he followed it, he had with him an aerial photograph of the farm on which he had outlined the basins in ink. He reviewed this with Schoenborn during their discussions, and in his presence marked the areas agreed to be deleted. Later he transferred the markings to a transparent overlay, or mylar,[3] which became the drainage facility map certified by the Regional Director, and attached it to the indenture. There is in evidence an aerial photograph dated July 25, 1958 showing the Schoenborn farm and bearing some notations in Lukes' handwriting. The numerous basins are outlined in the manner to which he testified, and the markings indicating basins and ditches to be deleted are the same as on the final mylar and Drainage Facility Map. Lukes testified to the system by which the compensation to be paid was determined, and that if the easement covered only the five basins to which Mr. Schoenborn said he agreed, the payment would only have been about $325.[4]

3. Mylar is a clear plastic material. The mylar overlay contained an outline of the Schoenborn property which matched the aerial photograph. The overlay was put over the photograph and the wetlands and ditches to be deleted were then traced onto the mylar. The easement deletions were drawn in with a permanent marker.

4. *On cross-examination Mr. Lukes indicated that in 1965 the farm was worth $60 per acre. The FWS schedule permitted him to offer*

On April 22, 1972, Jerome and Ann Schoenborn bought the family farm from Ed and Martha. Ed informed Jerome that there was an FWS easement on some of the basins and indicated where the basins were. Jerome received the easement documents, but neither he nor his wife looked at them. Ed also told Jerome that the easement allowed Jerome to maintain all ditches on the farm. It is evidently the government's position that the cleaning or maintaining of a ditch existing when the easement was created was a violation of the covenant not to drain lakes, ponds, etc. "by ditching or any other means." Although defendant would prefer to be free to clean and maintain ditches, he has not directly argued for a narrower interpretation of the language.

The FWS began investigating possible easement violations on the Schoenborn farm in the mid–1970s. FWS personnel took aerial and ground photographs of the alleged violations in the late 1970s and early 1980s and visited the farm on several occasions. Eldon McLaury testified that he met with Jerome in May and June of 1979. McLaury followed his investigation with a letter to Jerome detailing the restoration that was needed to return the covered wetlands to their previous condition.[5]

The Schoenborns did not make the restorations.[6]

Jerome raised four arguments on appeal.

## II. ARGUMENTS

### A. Estoppel

■ As Jerome sees the facts, Lukes promised, or represented to the senior Schoenborns, that the easement would cover only five basins, but then created only four exceptions instead of the 55 or more which would have confined the easement to five basins. He also claims that Lukes also promised or represented that the Schoenborns would remain free to maintain all existing ditches. Leaving aside any distinction between a promise and a misrepresentation of an existing fact, Jerome would treat the unfulfilled promises or representations, if made, as a basis for estoppel against enforcement by the government of the easement in its final form.

Judge Devitt did not make findings resolving the conflict as to the conversations between Ed Schoenborn and Lukes. Lukes could not recall the details and described his customary practice culminating in the final form of the document. Although Ed Schoenborn, with some corroboration from his wife and another son, seemed definite in his testimony, Judge Devitt seemed unwilling to credit him fully, for he remarked that "[a]t the time of trial, memories of the discussion had faded." He also found that "fraudulent conduct ... has not been established."

Judge Devitt found that the senior Schoenborns did not reasonably rely on Lukes. "The easement and drainage facility map had been available for their examination before they were bound by it. The easement referred to the map, and the map was attached to the easement when Edward and Martha accepted payment from the government and when they transferred their encumbered property to Jerome." They did not look at these documents. "Their neglect was unjustifiable."

The United States Supreme Court has left open the question whether there could

---

$1,700 for an easement covering the entire farm and $1,000 for the easement described in the indenture and map. No evidence was offered to demonstrate that the $1,000 paid by the government was disproportionate to the reduction in value of the farm resulting from the easement.

5. The wetlands targeted for restoration in the McLaury letter do not coincide exactly with those listed in this case and the numbering of the basins and ditches in the letter is not the same as on Government Exhibit 4.

6. In October, 1981 Jerome was tried in a criminal action and acquitted of knowingly injuring the property of the United States. Although the judge found that the easement was valid and enforceable, and that Jerome had caused drainage and thereby injured property of the National Wildlife Refuge System, he decided that the government failed to prove that Jerome had "knowingly" drained the prohibited areas. Because of the acquittal, Judge Devitt declined to consider Jerome collaterally estopped by the findings against him on validity and damage.

be any circumstances under which estoppel may run against the government, although it is well settled that the government may not be estopped on the same terms as any other litigant. *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). "But however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." *Id.* at p. 61, 104 S.Ct. at p. 2224. One of those elements is reasonable reliance. *Id.* at p. 59, 104 S.Ct. at p. 2223.

The Eighth Circuit has also left undecided the question of applying estoppel against the federal government. *See McDermott v. United States*, 760 F.2d 879, 882 (8th Cir.1985); *Chien–Shih Wang v. Attorney General of the United States*, 823 F.2d 1273, 1276 (8th Cir.1987). This court has recognized that "even if equitable estoppel is applicable against the government only a showing of 'affirmative misconduct' will suffice." *McDermott*, 760 F.2d at 882.

"Estoppel requires a representation, to a party without knowledge of the facts *and without the means to ascertain them*, upon which the party asserting the estoppel *justifiably relies* in good faith to his detriment." *Ridens v. Voluntary Separation Program*, 610 F.Supp. 770, 777 (D.C. Minn.1985) (emphasis added). The district court found that Ed Schoenborn had the means to acquire knowledge that the easement he thought he had given was not portrayed on the map he received in April of 1965. He must have known in January the importance of an accurate map, and the admonition in April to examine the map was clear. Reliance on Lukes' representations, if made as claimed, was not justified.

Further, the district court determined that "fraudulent conduct ... has not been established." At most, Lukes may have

been mistaken or negligent in drawing the map. These findings of the district court are supported by the record and are not clearly erroneous.[7]

### B.  Validity of the Easement

■ 1. Jerome makes an argument based on the fact that the written instrument signed by the parties January 27, 1965 was not complete. It provided for exceptions to be shown on a map to be attached at a later date. Lukes' testimony as to his usual practice suggests that markings on an aerial photograph were then in existence, had been agreed upon, and would be reflected in the map to be later certified if the government accepted the easement. But any possible merit to the argument that the indenture is invalid because at the date it was signed it omitted this significant material vanished in May, 1965 when the certified map was attached, the Schoenborns were asked to check the map and point out errors, and they accepted and cashed the tendered check. The document was complete by that time.

■ 2. Two other arguments, claiming lack of informed consent by the senior Schoenborns, and mutual or unilateral mistake, rest upon the proposition that Ed's testimony as to his oral agreement with Lukes was accurate. There was no finding that it was, and Judge Devitt found that memories of the event had faded. There was a conflict between Ed's testimony that he agreed to an easement covering five basins, and Lukes' testimony (admittedly based on customary practice) that the map showed the only exceptions. The conflict has not been resolved except to the extent that Judge Devitt found that fraudulent conduct has not been established. We conclude, however, that the parol evidence rule forecloses the claim that the parties orally agreed in 1965 to something different from the completed document on record.[8]

---

7. *See Azar v. United States Postal Service*, 777 F.2d 1265, 1269–70 (7th Cir.1985) with respect to standard of review of a finding on this issue.

8. There is in evidence a handwritten note, dated April 30, 1965. It purports to be signed by

Edward and Martha Schoenborn and to acknowledge receipt and correctness of the easement and drainage facility map. There was testimony identifying markings which showed it was received in the FWS Office May 14, 1965. The Schoenborns testified that they neither

## C. Violations of the Easement

■ Judge Devitt found violations with respect to six ditches and four basins, and ordered Jerome to restore them, expressing the hope that the parties could proceed toward that end in a mutually agreeable manner. He also enjoined further draining and filling in violation of the easement.

In general, the government's evidence consisted of aerial photographs at different dates, testimony interpreting them, and testimony of visual observations.

Jerome argues that the findings of violation are clearly erroneous. We will discuss the violations in several groups.

### 1. Ditches 1, 2, 5, 6 and 8[9]

Judge Devitt found that these ditches "have been leveled and some have debris in them."

As we read the easement the filling or leveling of a drainage ditch is not a violation unless this activity increases the capacity of the ditch to drain "surface water including lakes ..." etc. Jerome testified that he had cut down the steep sides of some of the ditches, "veed" them, in order to get farm machinery across them more easily. Where that is all that occurred, and the operation did not increase the drainage capacity of a ditch which was not already a violation of the easement, we agree with him that no violation has been shown.

Ditch 6 runs from one small basin to another in the central part of the farm. It existed in 1966. We have found no evidence in the record that cleaning or other work has been done on it. Accordingly, we modify the judgment so as not to require restoration of Ditch 6.

The other ditches in this group will be dealt with later.

### 2. Basins A & B and Ditches 1 & 5

Basins A and B are in the east central portion of the farm. Ditch 1 runs from B to A and Ditch 5 from A into another Basin. Water flows from B to A.

Judge Devitt found that excavations and alterations of Ditches 1 and 5 have affected Basins A and B.

Exhibit E (1966) showed that Basins A and B contained water. In May, 1976 the woods surrounding the basins had been cleared. In May, 1978 Basin A contained a large pile of debris and had a poorly-defined ditch (5) running from it. Basin B was filled with water at the time and had no ditch flowing from it. By November, 1978 both basins were poorly defined and "worked up." Basin A had soil in it. In May, 1979 debris around Basin A included acquatic vegetation. In June of that year, McLaury requested restoration of Basin B, particularly that soil be removed to the basin's original depth. By May, 1980, McLaury no longer considered Basins A and B to be wetlands. In 1981, 18 inches of fill were found in A and both A and B were in standing crop in August of that year, although water was standing in other nearby wetland areas.

The 1966 photo did not show Ditch 1, but by November, 1978 the ditch was constructed. In May, 1979 exposed clay indicated that soil had been removed from the ditch. Jerome admitted that he "veed out" the ditch to allow farm machinery to pass. In May, 1978 Ditch 5, leading from Basin A, was poorly defined. A November, 1978 photo showed excavation in the ditch, and a May, 1979 photo showed exposed clay. Jerome admitted that he removed trees in the area and "sloped out" the ditch.

The finding of violation is not clearly erroneous and supports the order that defendant restore these ditches and basins. There was also evidence that there had been some filling of the basins, although

---

wrote nor signed the letter, and contend it was a forgery. Judge Devitt noted that neither party produced a handwriting expert and that resolution of the dispute would not affect the outcome. He declined to offer an opinion on the authenticity of the signatures. We do not rely on this letter.

9. Ditches are numbered 1 through 9 and Basins A through D on Exhibit E, an aerial photograph dated July 30, 1966, with transparent overlays.

there was a dispute over the extent. Judge Devitt made no specific finding on this point. If in the process of restoration, the parties are unable to agree on the amount and types of material to be removed from Basins A and B, it will be necessary for the court to make additional findings, hearing additional evidence, if necessary.

### 3. Basin C and Ditch 2

Basin C appears to be a swale crossing the southeast corner of the main portion of the farm. Ditch 2 lies within and along it, and appears to drain northeasterly onto adjoining land. Judge Devitt found that Ditch 2 had been leveled and also evidenced exposed clay and wheel tracks from leveling activities.

Basin C did not clearly show a ditch within it in the 1966 photograph. In May, 1976, a photo showed the woods had been cleared, but the basin remained intact. By November, 1979, Ditch 2 had been excavated and previously-deposited material had been smoothed out within the basin. In May, 1980, brush and vegetation had been removed from the basin. A year later Ditch 2 had been further excavated and by August was cut starkly in Basin C. Jerome admitted he removed trees from Basin C (not in itself a violation), but claimed Ditch 2 was a natural waterway and he had only "veed" it out.

The finding is not clearly erroneous. The type of work found to have been done in Ditch 2, running as it does through a swale, must necessarily have increased drainage of the swale, and thus have violated the easement.

### 4. Basin D and Ditch 3

Basin D is in the central portion of 80 acres which adjoin the main portion of the farm at the southwest. Ditch 3 runs east from Basin D.

Judge Devitt found that the government produced evidence that Ditch 3 had been constructed.

There was evidence that Basin D was filled with water in May, 1979, and a ditch was constructed heading east from D through woods to a downhill gradient. In May, 1980, Basin D was cultivated and not well defined. By August, 1981, Basin D could hardly be seen under standing crop.

The finding is not clearly erroneous. Although restoration, presumably filling, of Ditch 3, is not referred to in the judgment, restoration of Basin D is ordered, and necessarily includes prevention of drainage through Ditch 3.

### 5. Ditch 7

Ditch 7 is the westerly portion of the 80 acres above referred to. A township road is the north boundary of the 80 acres at that point, and Ditch 7 runs south from the culvert. It has not been shown that Ditch 7 drains any wetland except a pond or slough on neighboring property, which drains through the culvert. A portion of that pond, at another location, lies on Schoenborn land.

Judge Devitt found that Ditch 7 "has been cleaned out exposing the clay." A photograph clearly supports this proposition.

Jerome, however, makes the point that the culvert limits the drainage from the pond north of the road, and therefore any cleaning or deepening of Ditch 7 could not increase the drainage from the pond. The only answer by the government was the suggestion by a witness that the town had reconstructed the culvert and Ditch 7 had been worked on at the same time. Under these circumstances, including the involvement of the town, we conclude that the finding does not support the order to restore Ditch 7, and we modify the order accordingly.

### 6. Ditch 8

Ditch 8 runs southerly, beginning a short distance from the southerly end of Ditch 7. Its upper portion lies within a basin.

Judge Devitt found that it had been leveled (presumably cleaned out). On the 1966 photograph (Exhibit E), it appeared as a poorly defined and vegetated ditch or natural waterway. In 1976, it was well-defined and cleaned out and had soil piled at each end. In August, 1978, it had two

years' growth of vegetation in it. Jerome admitted sloping it out.

Like Ditch 2, Ditch 7 drains the basin within which it runs, and cleaning it out would necessarily increase that drainage. We conclude that the finding was not clearly erroneous and supports an order for restoration.

### D. Jury Trial

When Jerome filed his answer and counterclaim, he also entitled it "Jury Demand." One week before trial, the government moved for an order striking the jury demand, pointing out (1) that the government's action was in equity where there is no right to a jury trial, (2) that some of the counterclaims were also in equity, (3) that all the counterclaims were against the United States, (4) that there is no constitutional right to trial by jury of an action against the United States, and (5) that no statute grants a right to trial by jury on any of these claims.

Judge Devitt granted the motion September 22, 1986, the day before trial. He acknowledged that the motion was untimely, but agreed with the propositions stated by the government. He noted that the only jurisdictional basis alleged in the counterclaim was 28 U.S.C. § 2409a, Real property quiet title actions. Subs. (f) provides that an action under that section shall be tried by the court without jury.[10]

Jerome argues that Judge Devitt abused his discretion in striking his jury demand upon the untimely motion of the government. He does not take issue with the proposition that he had no constitutional nor statutory right to a jury trial, but relies only on the late filing of the government's motion. He points out that on March 15, 1985 the magistrate had signed a pretrial schedule providing that "All nondispositive

motions, specifically those which relate to discovery and the discovery period shall be filed and heard prior to December 1, 1985." He argues that this applied to the government's motion to strike the jury demand and that the government failed to obtain an enlargement of time under Rule 6(b), Fed. R.Civ.P. for cause and excusable neglect.

Rule 39(a) provides that when a jury demand has been filed there shall be a jury trial unless "the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States." Jerome virtually concedes that Judge Devitt would have had discretion to strike the jury demand on his own motion. He argues, however, that the interest of the court in enforcing its pretrial orders made it an abuse of discretion to consider an untimely motion.

Assuming the pretrial schedule applied to a motion to strike a jury demand, it was clear that Jerome had no right to a jury trial, and we find no abuse of discretion in considering the question of striking the demand.

The judgment appealed from is MODIFIED so as not to require restoration of Ditches 6 and 7, and in all other respects is AFFIRMED.

---

10. Jerome's counterclaim included causes of action for rescission, reformation, fraud, unconstitutional taking, estoppel, quiet title (28 U.S.C. § 2409a), negligence, and malicious prosecution. The claims of fraud and malicious prosecution had been earlier dismissed on account of sovereign immunity. On September 22, 1986, Judge Devitt also dismissed the claims of reformation and rescission on the same ground. He considered 28 U.S.C. §§ 1346 and 1491 (the Tucker Act) and §§ 1346 and 2671 et seq. (the Tort Claims Act), though unpleaded, with respect to the claims of unconstitutional taking and negligence. Section 2402 provides that any action against the United States under § 1346 (except for subsec. (a)(1), not applicable here) "shall be tried by the court without a jury."