2000 D.S.D. 7

**UNITED STATES of America, ex. rel. CROW CREEK SIOUX TRIBE, d/b/a Crow Creek Farm Enterprise, Dacotah Farms, Crow Creek Farms, and William Shields, Jr. a member of the Crow Creek Sioux Tribe, Individually, Plaintiffs,**

v.

**HATTUM FAMILY FARMS, Hattum Custom Farms, and Robert Hattum, Defendants.**

No. Civ98–3020.

United States District Court, D. South Dakota, Central Division.

Feb. 2, 2000.

Charles Rick Johnson, Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, SD, for plaintiffs.

Robert B. Anderson, May, Adam, Gerdes & Thompson, Pierre, SD, for defendants.

## ORDER AS TO SUMMARY JUDGMENT MOTION

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] The Crow Creek Sioux Tribe ("Tribe") and William Shields, Jr. ("Shields"), an enrolled member of the Crow Creek Sioux Tribe, have brought this action [1] against Hattum Family Farms ("Hattum Farms") and Robert Hattum ("Hattum") to set aside a lien being claimed on the Tribe's crops, to require Hattum to render an accounting of all benefits received from Tribal land, and to

recover for damages as to the Tribal land. Defendants have counterclaimed, requesting damages for unpaid salary sums, amounts due on the written contract for custom farming, and damages claimed to be recoverable under theories of unjust enrichment and breaches of contract arising from both the written contract and claimed oral agreements. For all practical purposes, the Tribe dealt with Robert Hattum who did business as Hattum Family Farms or Hattum Custom Farms. No corporate form or other limited liability entity is involved. Payments from the Tribe were made to Hattum personally. Thus, the defendants will be referred to simply as Hattum. Hattum is, in reality, the only defendant since he was simply doing business personally and under two other names. The correct caption as to the "defendants" should have been Robert Hattum, individually and d/b/a Hattum Family Farms and Hattum Custom Farms.

[¶ 2] Plaintiffs filed on July 16, 1999, a motion for partial summary judgment, Doc. 29, arguing that none of the contracts claimed by Hattum as the source of payments owed to him were approved by the Secretary of the Interior pursuant to 25 U.S.C. § 81. Plaintiffs ask the Court to declare all contracts between the Tribe and Hattum null and void and to require Hattum to render a full and complete accounting; plaintiffs also seek a refund of all funds paid to Hattum as a result of the claimed void contracts. Hattum did not respond to this motion. See D.S.D. LR 7.2 (stating that opposing parties have twenty days after the service of a motion to respond). Counsel for Hattum did write to the Court (without filing the document) on August 24, 1999, and stated that the parties had reached an agreement that Hattum could have until September 15 to respond to the pending motion for partial

---

1. Plaintiffs bring a *qui tam* action. As stated in *U.S. ex rel. Yankton Sioux Tribe v. Gambler's Supply, Inc.*, 925 F.Supp. 658, 667 n. 11 (D.S.D.1996): "Qui tam is an abbreviation of the Latin phrase 'qui tam pro domino rege quam pro si ipso in hac parte sequitur' which means 'Who sues on behalf of the king as well as for himself.' Black's Law Dictionary at 1262 (7th ed.1999)." *Qui tam* is also described as a "bounty hunter's" statute. *Id.*

summary judgment, stating also that a stipulation would be forthcoming. No such stipulation or proposed Order has ever been presented. Counsel for Hattum also stated in Doc. 31 filed on August 2, 1999, that Hattum would be filing a response to the summary judgment motion. Nothing further was heard. Hattum was in serious default in connection with the motion for a partial summary judgment. In addition, Hattum did not timely file the "opposing party's required statement of material facts" as contemplated by D.S.D. LR 56.1(C). The parties have stipulated various times to extend the time for discovery and such stipulations have been approved by the Court. The discovery deadline ended on November 15, 1999, but all deadlines previously established by the Court's Scheduling Order and all Amended Scheduling Orders were indefinitely suspended pending a final judicial determination of this motion (Doc. 51). Extending the time for discovery obviously does not extend the time to respond to a motion, especially a motion for a partial summary judgment.

[¶ 3] After the Court brought the defaults to the attention of counsel, Hattum filed a motion to be relieved of default. Such motion was opposed by plaintiffs. The Court relieved Hattum of default and Hattum has filed documents in opposition to the motion for a partial summary judgment (Docs. 52, 53, 54 and 55) and a request for oral argument (Doc. 56). Plaintiffs have filed two documents to reply to the Hattum documents. The Court will decide the motion on the merits rather than as a default matter.

## DECISION

### I. Standing.

[¶ 4] "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." *Marine Equip. Management Co. v. U.S.*, 4 F.3d 643, 646 (8th Cir.1993), *citing Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501, *reh'g denied* 476 U.S. 1132, 106 S.Ct. 2003, 90 L.Ed.2d 682 (1986), citing in turn *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has "admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." *Rock Island Millwork Co. v. Hedges–Gough Lumber Co.*, 337 F.2d 24, 26–27 (8th Cir. 1964); *Sanders v. Clemco Indus.* 823 F.2d 214, 216 (8th Cir.1987).

[¶ 5] Standing under Article III of the United States Constitution "is a threshold issue, and [the plaintiff] must fulfill standing requirements to bring" an action under 25 U.S.C. § 81. *Schmit v. Int'l Fin. Management Co.*, 980 F.2d 498, 498 (8th Cir. 1992). "Title 25 U.S.C. § 81 'was enacted solely for the protection and benefit of Indians'" and plaintiff must allege an interest within the zone of interests protected by § 81. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498–502, 95 S.Ct. 2197, 2204–2207, 45 L.Ed.2d 343 (1975)).

[¶ 6] This is a *qui tam* action, brought in the name of and on behalf of the United States, as is required by 25 U.S.C. § 81 and Fed.R.Civ.P. 17(a) ("... when a statute of the United States provides, an action for the use or benefit of another shall be brought in the name of the United States."). *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1212 (7th Cir.1995).

> *Qui tam* suits by definition involve suits brought by private parties to assist the executive branch in its enforcement of the law, the violation of which affects the interest of the government, not the individual relator, whose only motivation in bringing the suit is to recover a piece of the action given by statute. So when a legislative body enacts provisions enabling *qui tam* actions, that act carries with it an understanding that in such suits it is the government, and not the individual relator, who has suffered the injury resulting from the violation of the

underlying law and is therefore the real plaintiff in the action. *Id.* "It is enough, then, that the United States, as the entity on whose behalf and in whose name this suit was brought, has suffered an injury-in-fact under Article III." *Id.* at 1214. The matter of standing, however, in *qui tam* suits is not the same in the Eighth Circuit as it is in the Seventh Circuit and other circuits. As we know from *Schmit v. Int'l Fin. Management Co., supra,* the party plaintiff must show standing, i.e. injury and a party who is "within the zone of interest protected by § 81."

[¶ 7] It is undisputed that the Tribe is an Indian Tribe whose tribal government is operated pursuant to a Constitution approved by the United States Secretary of the Interior and that William Shields, Jr. is an enrolled member of the Tribe. It is clear that the Tribe entered into written custom farming contracts with Hattum and that the Tribe paid Hattum over $1 million under these contracts and apparently under oral understandings allegedly "backed up" by Tribal Council resolutions.

[¶ 8] The *qui tam* relators are proper parties to represent the United States in this action because one is the actual Tribe owning (directly or by virtue of land held in trust status) the farmland in question and the other is a member of that Tribe. Clearly, they are within the zone of interests protected by § 81. There is also no question that the United States, if 25 U.S.C. § 81 has been violated, has suffered a sufficient injury and therefore has standing to maintain this action through the *qui tam* relators. Standing is established.

## II. Summary Judgment.

[¶ 9] Summary Judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Donaho v. FMC Corp.,* 74 F.3d 894, 898 (8th Cir.1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir. 1995). In considering the motion for partial summary judgment, this Court must view the facts in the light most favorable to Hattum and give Hattum the benefit of all reasonable inferences that can be drawn from the facts. *Donaho,* 74 F.3d at 897–898.

[¶ 10] Plaintiffs claim that Hattum's counterclaim fails as a matter of law because none of the contracts Hattum claims as the sources of payments owed him were approved by the Secretary of the Interior pursuant to 25 U.S.C. § 81.

. [¶ 11] 25 U.S.C. § 81 provides, in relevant part:

> No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value ... in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows:

> \* \* \* \* \* \*

Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.

\* \* \* \* \* \*

All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services, in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid.

[¶ 12] In a given case, in order to prove that a particular contract is one subject to the Secretary of the Interior's approval, a plaintiff must show that: (1) the disputed contract was "with any tribe of Indians," (2) the contract was "for the payment or delivery of any money or other thing of value . . . or for the granting or procuring any privilege . . . in consideration of services for said Indians; and (3) the contract was relative to their [Indian] lands." *See* 25 U.S.C. § 81 and *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 808 (7th Cir.1993). Taking the facts of the present case, the plaintiffs must prove that an agreement was made by Hattum with the Tribe for the payment of money in consideration of services by Hattum for the Tribe relative to Tribal land. *See U.S. ex rel. Harlan v. Bacon*, 21 F.3d 209, 211 (8th Cir.1994).

[¶ 13] This Court has read and considered the four written contracts. The first written contract is not dated and covers the 1993 growing season. *See* Hattum affidavit (Doc. 52), exhibit A. Apparently, such agreement was also used by the parties to cover the 1994 season. The second written contract dated March 1, 1995, cov-

ers the 1995 growing season. *Id.*, exhibit B. The third written contract is not dated but does clarify that the agreement will be effective on February 13, 1996. This contract was approved by a tribal resolution on February 6, 1996. *Id.*, exhibit C. Lastly, the fourth written contract, dated May 15, 1998, covers a one year term and was approved by a tribal resolution on May 28, 1999. *Id.*, exhibit D.

[¶ 14] As to the first question, the written contracts for custom farming services were between the Tribe and Hattum. Hattum is specifically referred to in the resolutions adopted by the Tribal Council. Checks were written to Hattum. However, Hattum recently argues that the contracts were not with "any tribe of Indians" but rather with Crow Creek Farms, Inc. or Dacotah Farms or both such entities, entities separate and apart from the Tribe. Yet Hattum presents no evidence that Crow Creek Farms, Inc. is or ever was a corporation. This Court may and does take judicial notice of public records, namely that there is no record in the office of the South Dakota Secretary of State to establish that there was ever any corporation known as Crow Creek Farms, Inc. Likewise, there is no record of any corporation known as Dacotah Farms or Dacotah Farm. Plaintiffs have, in addition, now presented evidence to show that there is not now and never has been any corporation acting on behalf of the Tribe with regard to the Tribe's farm and land. The Court rejects Hattum's recent argument and claim of a genuine issue of material fact. There is no genuine issue of material fact in that regard. Although the Tribe has conducted its farming operations under the names of Crow Creek Farm Enterprise, Dacotah Farms, Dacotah Farm, and Crow Creek Farms, Inc., these names represent only separate divisions of the Tribe for management and accounting purposes. Hattum cannot escape his affidavit of April 30, 1999 (Doc. 19). Therein, he states under oath at least seven times that the Tribe was doing business as Crow

Creek Farms and Dacotah Farms. He states (Doc. 19, para.4) that he believes that the land in question "is either owned by the Crow Creek Sioux Tribe or owned by the United States of America in trust for the Crow Creek Sioux Tribe d/b/a Crow Creek Farms a/k/a Dacotah Farms." It is elementary law that Hattum cannot claim a better version of the facts than he has previously asserted under oath. He has counterclaimed in this action against the Tribe and has not sought to file any third party complaint against some other claimed entity. The reason is that no such entity exists.

[¶ 15] Two written contracts titled "Dacotah Farm Custom Farming Contract" for the 1996 and 1998 farming years were signed by Duane Big Eagle, then chairman of the Tribe. See Hattum affidavit (Doc. 52), exhibits C and D. Hattum questions the first written contract for the 1993 growing season based on the stationary heading of "Crow Creek Farms, Inc.," even though the text clearly states, "Crow Creek Farm has hereby hired Bob Hattum to do custom farming on the Crow Creek Farms, owned by the Crow Creek Sioux Tribe . . . ." The signature blank shows only Crow Creek Farms and there is no signature by any purported corporate officer. No later agreement made any reference to Crow Creek Farms, Inc. but only to Dacotah Farm or Dacotah Farms. Despite the recent claim of Hattum that he did not know whether he was dealing with the Tribe, all plaintiffs and even Hattum without doubt consider the Tribe and Crow Creek Farm Enterprise, Dacotah Farms, Dacotah Farm, and Crow Creek Farms to be interchangeable. That is obviously true as well with regard to the "nonexistent corporation" referred to as Crow Creek Farms, Inc. See Hattum affidavit (Doc. 19), ¶¶ 2, 4, 5, 8, 10, 11, 13, and 14. This case presents facts unlike the facts in *Inecon Agricorporation v. Tribal Farms, Inc.*, 656 F.2d 498 (9th Cir.1981), where the owner of the farmland was not the tribe but an Arizona corporation, thus not falling within the protected class of "tribe of Indians or individual Indians" covered by the statute. All land in question in the present case was owned by the Tribe or by the United States of America, in trust for the Tribe, and, as previously discussed, Hattum has admitted this.

■ [¶ 16] The second question to address is whether the contracts were "for the payment or delivery of any money or other thing of value . . . or for the granting or procuring (sic) any privilege . . . in consideration of services for said Indians." 25 U.S.C. § 81. In *U.S. ex rel. Harlan v. Bacon,* Judge O'Brien held that a farm sharecrop lease was not an agreement in consideration of services for the Indians within the meaning of 25 U.S.C. § 81. 851 F.Supp. 367, 369 (N.D.Iowa 1993). The court held that a lease granted to the defendants to grow crops on Indian lands was not similar to bingo management contracts, land development contracts, attorney fee contracts, or the like, contracts that are all subject to § 81. *Id.* Judge O'Brien noted that the defendants had distinguished *Inecon Agricorporation v. Tribal Farms, Inc.,* 656 F.2d 498 (9th Cir. 1981), on the basis that such case "involved land development and management contracts which are services contracts" and that the *Inecon* court did not reach the § 81 question. 851 F.Supp. at 368. The Eighth Circuit affirmed the District Court, holding that 25 U.S.C. § 81 does not apply to a lease of Indian lands for the purpose of sharecropping. *See U.S. ex rel. Harlan v. Bacon,* 21 F.3d 209 (8th Cir.1994). The specifics of the sharecropping arrangement involved the defendants leasing farmland from the Omaha Indian Tribe with 40% of the produce to be delivered to the tribe. 21 F.3d at 210. The Court of Appeals stated, in summary: "Because the tribe received crops and not services, we hold that the statute is inapplicable to the lease at issue here." *Id.* at 212. Hattum was, of course, not leasing anything from the Tribe although he was involved in relatively minor sharecropping arrangements, as will later appear.

[¶ 17] Two tribal resolutions were passed approving contracts for custom farming services. The first tribal resolution dated February 7, 1995, approved and certified Hattum as the "Dacotah Farm Assistant Farm Manager" and set his "salary." at "$25,000.00 per year and/or (sic) shall be entitled to percentage of farm profits." *See* Wells affidavit (Doc. 15), exhibit 8. This language used in the resolution is, of course, most imprecise. On May 28, 1998, a second tribal resolution was adopted, stating that Hattum "has provided invaluable assistance to Dacotah Farms as a custom farmer and Assistant Farm Manager, for several years, and Mr. Hattum posseses (sic) the equipment and expertise to continue to assist the Dacotah Farms in this capacity." *See* Wells affidavit, exhibit 7. Such resolution authorized the execution of the "custom farm contract" and authorized the compensation for Hattum for the next year to be negotiated by the Tribal attorney and the farm manager "in the best interest of the Dacotah Farms and Crow Creek Sioux Tribe." A one year irrevocable term contract with Hattum "for custom farming services for Dacotah Farms" was authorized. This is also somewhat confusing since apparently the written contract with Hattum had already been negotiated and signed on May 15, 1998. *See* Wells affidavit, exhibit 12. The then Tribal Chairman had already signed the contract but the Tribal Council proceeded as though nothing had yet been negotiated or signed and delegated their important responsibilities to the farm manager and Tribal attorney.

[¶ 18] The two written contracts titled "Dacotah Farm Custom Farming Contract" which were between Hattum and the Tribe specified, under the title "Nature of Services," that the "[c]ontractor shall be retained to provide custom farming, credit assistance and technical assistance relative to the overall operation of the Dacotah Farm." *See* Wells affidavit, exhibit 12, and Hattum affidavit (Doc. 52), exhibit C. The contracts state under the title "Term": ". . . this' agreement for custom farming and related services . . ." *Id.* Although both contracts did provide that "[a]ll hay and alfalfa shall be put up on a crop share basis of 60/40 with the farm receiving the 40%," no other provisions of the agreements dealt with sharecropping. The balance of the contracts have Hattum being paid for services, namely compensation in the form of so many dollars per acre, with the price depending on the specific work or services performed. Fourteen service items are specified in the contracts. *Id.* Payments were to be made "as funds become available from sales of crops and line of credit from Norwest Bank." Hattum was to be paid interest, the rate being set at 10.5% per annum in the 1996 contract and 7.5% in the 1998 contract "on any unpaid balance carried through the year." *Id.* Hattum, in his own words, has stated that the ". . . Crow Creek Sioux Tribe . . . owed me a substantial amount of money for custom farming services I had supplied pursuant to contract. . . ." *See* Hattum affidavit (Doc. 19), ¶ 11. The earlier contracts, not approved by tribal resolution, are similar to the contracts titled "Dacotah Farm Custom Farming Contract." Both contracts provide for numerous service items and indicate that Hattum will be paid certain interest rates on the "balance remaining for custom work" or "any balance carried through the year." *See* Hattum affidavit (Doc. 52), exhibits A and B. Unlike *Harlan*, we are not dealing by any means with only sharecropping contracts. The contracts provide for described services to be rendered in exchange for money compensation. Obviously, in a sharecropping arrangement, if there is a total crop failure, both Hattum and the Tribe would receive nothing. When performing services for money, crop failures, partial or complete, are immaterial. The owner or beneficial owner of the land, the Tribe in this case, bears all the risk in paying for custom farming operations or services. There is thus a substantial difference between the Tribe sharecropping as distinguished from the Tribe paying for specified services to a custom operator.

[¶ 19] The United States Supreme Court has told us that federal statutes concerning Indian tribes must be construed "liberally in favor of the Indians." *See Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). With that instruction, it is clear that the written contracts in this case were "for the payment of money … in consideration of services for said Indians." *See Penobscot Indian Nation v. Key Bank,* 112 F.3d 538, 545 (1st Cir. 1997).

[¶ 20] The last part of the inquiry is whether the contract was "relative to Indian lands." In *Altheimer & Gray v. Sioux Mfg. Corp.,* the Seventh Circuit set forth four factors which they deemed to be important in determining whether a management contract is relative to Indian lands:

1. Does the contract relate to the management of a facility to be located on Indian lands?

2. If so, does the non-Indian party have the exclusive right to operate the facility?

3. Are the Indians forbidden from encumbering the property?

4. Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?

983 F.2d 803, 811 (7th Cir.1993). In considering this case, it is important to keep in mind that, quoting from an earlier Seventh Circuit case, "it is obvious from the broad language 'relative to their lands' that Congress intended to cover almost all land transactions in Indian property." *Wisconsin Winnebago Bus. Comm. v. Koberstein,* 762 F.2d 613, 618 (7th Cir.1985).

[¶ 21] This Court respectfully disagrees with what could be called a four factor test as set forth in *Altheimer* and cited by Hattum. This is despite the fact that the *Altheimer* approach was approved in *Penobscot Indian Nation v. Key Bank, supra.* The four factors have the practical effect of significantly narrowing the scope of the clear language of the statute. To state the matter fairly, however, *Altheimer*

includes this statement: "To quote the Ninth Circuit, none of the above factors are the '*sine qua non*' of a contract which relates to Indian lands." 983 F.2d at 811.

[¶ 22] *Altheimer* is also inapposite since the only Hattum contract that is in writing does not "relate to the management of a facility to be located on Indian lands." There is here no "facility." We have only the Indian land itself.

[¶ 23] The *Altheimer* approach has never been endorsed by the Eighth Circuit. We are not at liberty to rewrite the statute and the *Altheimer* four factors are not a part of § 81. This Court prefers the approach taken by now Eighth Circuit Judge Diana Murphy in *U.S. ex rel. Shakopee Mdewakanton Sioux Community v. Pan Am. Management Co.,* 616 F.Supp. 1200 (D.Minn.1985). "It is uncontroverted that the statute, 25 U.S.C. § 81, was enacted solely for the protection and benefit of Indians." *Id.* at 1208. "Section 81 is drafted broadly to encompass any agreement made by 'any person' involving payment in consideration 'of services for … Indians relative to their lands or to any claims growing out of, or in reference to, annuities….'" *Id.* at 1216. "The plain meaning of the statute is that its provisions apply either to agreements relative to their lands, 'or' alternatively, to claims by the tribes growing out of the listed events and arising 'under laws or treaties with the United States.' *See* F. Cohen, *Handbook of Federal Indian Law* 281." *Id.* The statute does not support a narrow construction. *Id.*

> The broad language "relative to their lands" evidences the intent of Congress to cover almost all land transactions in Indian property. *See Central Machinery Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980) ("Until Congress repeals or amends the Indian … statutes … we must give them 'a sweep as broad as their language' and interpret them in light of the Congress that enacted them." (Indian trader statutes))

.... The language "relative to their lands" is clear and complete and· stands apart from the alternative language which follows the word "or".

*U.S. ex rel. Shakopee v. Pan Am. Management Co.*, 616 F.Supp. at 1216. "Interpreting § 81 to apply to all contracts relative to Indian land is also consistent with the longstanding policy of regulating all transactions in Indian land, which predates this country's formation as an independent nation." *Id., citing Wisconsin Winnebago Business Committee v. Koberstein & Ho-Chunk Management*, 762 F.2d 613, 618 (7th Cir.1985) and F. Cohen, *Handbook of Indian Law* 508–09 (1982). Discussing *Green v. Menominee Tribe*, 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914), Judge Murphy found "the language to be straightforward. *Green* supports the proposition that the plain meaning of § 81 compels its application to contracts relative to Indian lands." *U.S. ex rel. Shakopee v. Pan Am. Management Co.*, 616 F.Supp. at 1217. "Careful consideration of the parties' arguments and the legislative history against the backdrop of the statutory language and federal policy of regulating Indian land transactions leads the court to conclude that § 81 was intended to be applicable to contracts for services relative to Indian lands." *Id.* "The debates indicate that Congress intended the broad language incorporated in § 81 and that the language should be given its full meaning." *Id.* "Thus, statutes 'passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918))." *U.S. ex rel. Shakopee v. Pan Am. Management Co.*, 616 F.Supp. at 1218.

[¶ 24] The Hattum contracts are, with the narrow exception of the sharecropping arrangements as to hay and alfalfa and the salary agreements, very detailed contracts for the provision of specified services by Hattum. The 1996 and 1998 contracts contemplated Hattum providing "tractor and ·equipment" rentals to the Tribe for the Tribal land. As shown by copies of various checks (*See* Wells affidavit, exhibit 4), Hattum was paid $100,000 by Dacotah Farms, i.e. the Tribe, on January 14, 1998 (with a notation on the check that the partial payment was for custom farming for 1996 and 1997), $200,000 on April 24, 1998 (the copy of which includes a handwritten note stating "Total $560,779.00"), and $150,000 on June 2, 1998 (for custom farming operations). The copy of the $100,000.00 check written on January 14, 1998, includes notations that Hattum was paid $164,247.00 in 1997 and $250,000.00 plus an electronic transfer (shown by another exhibit to be in the amount of $100,000.00 as paid on January 2, 1998) in 1998. Hattum furnished an "accounting" (*See* Wells affidavit, exhibit 6) stating he had done "custom work" as follows: 1993, $195,146.25; 1994, $260,423.05; 1995, $271,130.30; 1996, $217,879.90; and 1997, $284,886.50. Hattum states he was paid a total of $1,091,000.00. He also claims "assistant manager wages" of $25,000 per year for 1995, 1996, and 1997 for a total of $75,000.00. He claims to be due interest at the rate of 10.5 percent although the 1998 written contract called for a rate of 7.5 percent.

[¶ 25] As already discussed, Hattum believes this farm to be land which is "either owned by the Crow Creek Sioux Tribe or owned by the United States of America in trust for the Crow Creek Sioux Tribe d/b/a Crow Creek Farms a/k/a Dacotah Farms." *See* Hattum affidavit ¶ 4. It is clear that the agreements involved farm land located on the Crow Creek Sioux Tribe Reservation, i.e. in Indian Country. There is no contention or anything in the record which would even suggest that this Tribal farmland was, like the land in *Penobscot Indian Nation v. Key Bank, supra*, a tract of real property purchased by the Tribe in fee simple to promote its business interests.

[¶ 26] It is clear to the Court that the contracts were "relative to Indian lands." Because the contracts were "relative to Indian lands", the contracts were subject to the approval of the Secretary of the Interior and the Commissioner of Indian Affairs or, more accurately, the Aberdeen Area Director as the official delegated by them to act. Having not been approved, the contracts are null and void with the exception of the contractual provisions as to sharecropping and the plaintiffs' motion for partial summary judgment should be granted, leaving for another day the questions as to damages.

[¶ 27] This Court nevertheless endorses the comments of the concurring judge in *U.S. ex rel. Hall v. Tribal Development Corp.*, 49 F.3d 1208, 1218 (7th Cir.1995): "The *qui tam* action in the present case reflects the paternalistic concern of a bygone era over Native Americans and their ability to contract. Whether, as a policy matter, such actions actually prevent fraudulent agreements or instead prove vexatious to the very interests they are designed to serve may well be open to debate, but that is an argument for another forum: namely, Congress." The assumption that some federal government employee knows more about how to run the business affairs of a Tribe than most elected Tribal officials is, very frankly, ridiculous, especially given the recent revelations of mishandling of trust funds and shredding of records by the federal government.

[¶ 28] The statute presents a deadly trap for the unwary, the careless, and those unfamiliar with Indian law. The application of the statute in this case may well present a case of moral injustice for Hattum. While the Court is not unsympathetic to one who has performed the services for Indian lands and now may be deprived of compensation, the Court is obligated to apply the law and follow what Congress has ordained.

### III. Approval of Contracts

■ [¶ 29] Hattum maintains that Steven McLaughlin, acting as the local BIA superintendent, actually executed and approved the contract for the 1996 growing season. Further, Hattum claims that McLaughlin had full knowledge at all times and that he periodically discussed the conduct of the farming operation throughout the entire time Hattum had custom farming contracts in effect. Hattum contends that McLaughlin's signed approval of the 1996 farming contract and *de facto* approval, claimed to be evident from the acquiescence by McLaughlin in the performance of the contracts for some five to six years, should constitute sufficient evidence of approval.

[¶ 30] Section 81 dictates that any agreement within its purview "shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it." The question this Court must answer is whether McLaughlin's signature on the 1996 contract establishes sufficient evidence of approval as required by 25 U.S.C. § 81.

[¶ 31] This Court could find and has been cited to no case addressing the question of whether a local BIA superintendent may approve contracts subject to 25 U.S.C. § 81. Case law does include references to BIA superintendents notifying parties that agreements did or did not require approval. *See U.S. ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (stating, ". . . the Superintendent of the Bureau of Indian Affairs notified the Bacons by letter that Section 81 of Title 25 and 25 C.F.R. Chapter 3 put them at risk.") and *Barona Group of Capitan Grande Band of Mission Indians v. Am. Management & Amusement, Inc.,* 824 F.2d 710, 714 (9th Cir.1987) (stating, "the Acting Superintendent of the Southern California BIA office notified the AMA that the 1981 agreement did not require its approval."). A review of the Code of Federal Regulations revealed that superintendents may make recommendations regarding the approval of attorney contracts exposed to 25 U.S.C. § 81. *See* 25 C.F.R. § 89.4 (1999). However, the review also revealed that the

contracts should be transmitted to the Area Director by the local superintendent which indicates that superintendents do not have the authority to grant final approval. *Id.; See also* 25 C.F.R. § 89.18 (1999) (stating changes to tentative form of contract "should be submitted through the superintendent to the Area Director for approval as to form prior to execution of a contract."). This Tribe comes within the jurisdiction of the BIA Aberdeen Area Office, located in Aberdeen, South Dakota. This Court also takes judicial notice that the practice of the BIA is to permit only the Area Director (and not agency superintendents) to approve contracts subject to § 81. Such approvals have been seen by this Court in other cases, including *Rosebud Sioux Tribe, et at. v. Gover, et al.,* CIV. 99–3003, —— F.Supp.2d ——, 2000 WL 874692 (D.S.D.2000).

[¶ 32] McLaughlin signed the contract, "Steve McLaughlin, Sup't (sic) Bureau of Indian Affairs." *See* Hattum affidavit (Doc. 52), exhibit C. There is no indication that McLaughlin even purported to be a designated representative of the Secretary of the Interior or that he was authorized to approve such contracts. He may well have been signing simply as a witness. No affidavit has been presented from him to state in what capacity he signed. The tribal resolution passed on February 6, 1996, makes no mention of McLaughlin or his alleged approval of the contract. *Id.* It is inconceivable that a BIA employee, claiming or purporting to act on behalf of the Secretary of the Interior, would not date a document or include some language suggesting that the contract had been approved pursuant to 25 U.S.C. § 81. Hattum has failed to present any issue of fact as to whether the 1996 contract was approved by the Secretary of the Interior or his authorized representative pursuant to 25 U.S.C. § 81. Clearly, it was not. As a matter of law, such contract is null and void for lack of such approval. Hattum's claim in his statement of disputed material facts (Doc. 54) that this is an issue of material fact is rejected by the Court.

## IV. Waiver and Estoppel

[¶ 33] Hattum defends this action and the motion for a partial summary judgment under the doctrines of waiver and estoppel, arguing that the plaintiffs mislead him when entering into the contracts and dealing with him. A *qui tam* plaintiff "by definition asserts not his own interests, but only those of the United States." *Cedars–Sinai Med. Ctr. v. Shalala,* 125 F.3d 765, 768 (9th Cir.1997). *Qui tam* plaintiffs "are merely agents suing on behalf of the government, which is always the real party in interest." *U.S. ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1215 (9th Cir.1996).

[¶ 34] It is well settled that the government may not be estopped on the same terms as other litigants. *United States v. Schoenborn,* 860 F.2d 1448, 1452 (8th Cir. 1988), *citing Heckler v. Community Health Servs.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Moreover, the Supreme Court has repeatedly indicated "that estoppel will rarely work against the government." *Conforti v. United States,* 74 F.3d 838, 841 (8th Cir. 1996), *citing Office of Personnel Management v. Richmond,* 496 U.S. 414, 423, 110 S.Ct. 2465, 2470–71, 110 L.Ed.2d 387 (1990). "The Supreme Court has imposed a more stringent standard for estopping the government because there is a strong public interest in upholding the rule of law, even where hardship may result to individuals in particular cases." *Chien–Shih Wang v. Attorney General of United States,* 823 F.2d 1273, 1276 (8th Cir.1987).

[¶ 35] The Eighth Circuit has recognized that "even if equitable estoppel is applicable against the government only a showing of 'affirmative misconduct' will suffice." *Schoenborn,* 860 F.2d at 1452, (quoting *McDermott v. United States,* 760 F.2d 879, 882 (8th Cir.1985)). Therefore, before considering the elements of traditional estoppel the Court will determine if Hattum has established any "affirmative misconduct"

on behalf of the government. Hattum claims that he was never advised that further scrutiny of the contracts or additional approval was necessary. The doctrine of estoppel has never been found to apply against the government in a case of this type. The case of *Chien–Shih Wang v. Attorney General of the United States, supra,* is illustrative. In *Wang,* the plaintiff filed the necessary papers for the adjustment of immigration status for himself and his family. *Chien–Shih Wang v. Attorney General of the United States,* 823 F.2d at 1274. The plaintiff was later notified that his application was incomplete as he had not furnished the necessary papers. *Id.* at 1275. In response, the plaintiff clarified that he had supplied the necessary documents and submitted a second set of documents. In the meantime, Congress amended the Immigration Act to impose more stringent eligibility requirements. The plaintiff filed suit, contending "that by failing to notify him at various points in the processing of his application that his file was incomplete, the INS in effect gave him erroneous advice." *Id.* at 1276. The Eighth Circuit found that, even though the INS delay in notifying the plaintiff of the status of his application was improper and INS errors in processing the plaintiff's application were to be criticized, there was no showing of affirmative misconduct. *Id.* at 1277. The Court discussed *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), in which a similar erroneous advice claim was made.

In that case, a government official incorrectly told the petitioner's mother that she could not return to the United States from abroad because she was pregnant. The petitioner was born outside of the United States as a result. The foreign birth was later used by the government as a basis for denying the petitioner United States' citizenship. 366 U.S. at 314–15, 81 S.Ct. at 1340. The Supreme Court found that the official's misrepresentation fell 'far short' of the misconduct required to justify estoppel against the government. *Id.*

*Wang,* 823 F.2d at 1276–77. Like *Wang* and *Kennedy,* Hattum has made, at best, an erroneous advice claim. The fact that Hattum was unaware and was not advised of the fact that his custom farming contracts with the Tribe required approval under 25 U.S.C. § 81 does not constitute affirmative misconduct. Hattum claims no misleading statements by anyone. There is no claim of erroneous advice, Hattum's complaint being that no advice was given. He cites no authority to show any obligation on the part of anyone to provide such advice. His claims and the undisputed facts show no "affirmative misconduct" on the part of the government.

[¶ 36] There is a further reason why estoppel does not aid Hattum. " 'Estoppel requires a representation, to a party without knowledge of the facts *and without the means to ascertain them,* upon which the party asserting the estoppel *justifiably relies* in good faith to his detriment.' " *Schoenborn,* 860 F.2d at 1452 (quoting *Ridens v. Voluntary Separation Program,* 610 F.Supp. 770, 777 (D.C.Minn.1985) (emphasis added)). Hattum could and should have consulted a lawyer. He chose not to do so and was penny wise and pound foolish. He was dealing with, in effect, a sovereign nation. He was entering into contracts involving, as it developed, more than $1 million. Any resident of South Dakota, including Hattum, would know that people occupying tribal offices often come and go and when they go, previous "favored parties" almost invariably become "disfavored parties." Common sense tells one that it is essential to have your legal "ducks in a row" when dealing with such far reaching matters as were involved here. Hattum failed to do that, at his peril.

[¶ 37] Now, therefore,

[¶ 38] IT IS ORDERED, as follows:

1) Plaintiffs' motion for partial summary judgment, Doc. 29, should be and is granted.

2) This is a final judgment as to some of the claims of the parties but fewer than all of the claims, the Court expressly directing that there is no just reason for delay and that a final judgment as to liability should now be entered accordingly.

3) Defendants' claim to estop the plaintiffs from enforcing the provisions of 25 U.S.C. § 81, Doc, 55, has no legal validity and a partial summary judgment in that regard is entered.

4) The contracts entered into between Hattum and the Tribe are null and void with the exception of those portions of the contracts dealing with sharecropping and those portions dealing with salary payments to Hattum.

5) The crop lien is void and Hattum shall forthwith release and satisfy the same.

6) The claim or defense of unjust enrichment and claims of breach of contract are devoid of legal merit and a partial summary judgment in that regard is entered.

7) As to the partial summary judgment being granted, there is no genuine issue of any material fact and plaintiffs are entitled to a judgment as a matter of law.

8) The request for oral argument (Doc. 56) is denied, given the excellent briefs filed by counsel for all parties.